597 So.2d 508 (1992)
STATE of Louisiana
v.
Jamal BATTIESTE.
No. KA 91 0021.
Court of Appeal of Louisiana, First Circuit.
March 6, 1992.
*509 Doug Moreau, Dist. Atty., by Don Wall, Asst. Dist. Atty., Baton Rouge, for plaintiff/appellee.
Otha Nelson, Baton Rouge, for defendant/appellant.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
Jamal Lejean Battieste was charged in a single bill of information with two counts of armed robbery, violations of La.R.S. 14:64. Count I charged the armed robbery *510 of Dr. Louis Jeansonne[1], and Count II charged the armed robbery of Nick Tessitora, Jr. Defendant entered pleas of not guilty to both charges. After trial by jury, defendant was found guilty as charged in Count I; and the jury returned a responsive verdict of guilty of first degree robbery on Count II. For the armed robbery conviction, the trial court sentenced defendant to imprisonment at hard labor for a term of ninety-nine years, without benefit of parole, probation or suspension of sentence; for the first degree robbery conviction, defendant was sentenced to imprisonment at hard labor for a term of forty years, without benefit of parole, probation, or suspension of sentence. The trial court ordered that the sentences run concurrently and that defendant receive credit for time served. This appeal followed.

FACTS
The instant offenses occurred at Dr. Louis Jeansonne's dental office in East Baton Rouge Parish, on Wednesday, October 5, 1988. At about 11:30 a.m.12:00 noon on that date, two black men came into the waiting room at the office and asked Jane Ross Mouton, the doctor's secretary, if the doctor sold gold crowns. Mouton answered in the affirmative and told the men that the crowns were not kept in the office and had to be ordered. After apparently being told the price of the crowns, the men left the office. Shortly thereafter, Mouton went home. Tessitora, who was in the doctor's waiting room to have some dental work done on his teeth, observed the two men come in and overheard the conversation concerning the gold crowns.
Tessitora testified that, after the two men left the office, the doctor saw someone pass by one of the windows of the office. The doctor and Tessitora went to the driveway in back of the office to investigate. When Tessitora got to the driveway he saw two men standing near the wall of the office. Tessitora and Dr. Jeansonne then walked from the back to the front of the office. Tessitora indicated to the doctor that what they had seen did not "look right" and that (because he thought he could defend himself better than Dr. Jeansonne) he should reenter the office ahead of Dr. Jeansonne.
After reentering the office, Tessitora began searching the rooms in the office. While Tessitora was in the hall, two men, each armed with a gun, jumped out of a room and one placed a gun to Tessitora's side. The gun was later placed to Tessitora's head. One of the perpetrators told Tessitora to lie on the floor with his face down. Tessitora did not comply, choosing instead to talk to the perpetrators to give himself time to decide what he was going to do.
In the meantime, Dr. Jeansonne had encountered the perpetrators too; and, from his vantage point in the hall, Tessitora observed that one of the perpetrators was trying to get the doctor to lie on the floor face down in one of the rooms at the rear of the office. Tessitora testified that the doctor told the perpetrators that he would lie on the couch inside the room but not on the floor. Tessitora saw the perpetrator using his gun to beat the doctor about his head because the doctor would not lie down on the floor. While observing the beating being administered to the doctor, Tessitora looked around to see if he could find "a good piece of iron" that he might use to strike the perpetrator who was with him in the hall. When Tessitora was unable to find a suitable object, he decided to walk up to this perpetrator in the hope of catching him off guard. However, when Tessitora walked up to the perpetrator, the perpetrator struck Tessitora in the head with a "triple-strength" hand-held mirror, which apparently shattered on impact. Tessitora pushed the perpetrator (who had struck him) against the wall and "tussled" with him. Both perpetrators then ran from the doctor's office.
During the incident, the perpetrators took the wallets of Dr. Jeansonne and Tessitora. *511 Tessitora testified that he felt he would have been killed if he had not given up his wallet.
The police were summoned, and officers with the Baton Rouge City Police Department went to the scene. The victims gave investigating officers an account of what had happened and provided descriptions of the perpetrators. The officers found no one fitting the descriptions in the area near the crime scene. Officer Robert Lively, a crime scene officer, dusted shards of the broken mirror that had been used to strike Tessitora and lifted latent fingerprints from the pieces onto seven fingerprint lifters.
The investigation of the offenses continued. A videotaped reenactment of the crimes was prepared for Crime Stoppers and broadcast. Thereafter the police received information naming two possible suspects, neither of whom was defendant. Detective Michael W. Morris obtained photographs of the two suspects, which were included in a photographic lineup that was shown to Tessitora, Dr. Jeansonne and Mouton. When the lineup was displayed to Tessitora, he identified one of the suspects as one of the robbers. However, after the suspect was arrested and placed in a physical lineup, Tessitora was unable to identify anyone in the physical lineup.
Later, after Officer Annie Michelli of the Baton Rouge City Police Department's Latent Fingerprint Division had been unsuccessful in identifying State Exhibit S-12 (a latent left thumbprint Lively had lifted from one of the pieces of the broken mirror), she submitted S-12 to the Latent Fingerprint Section of the Louisiana State Police. S-12 was entered into an automatic fingerprint identification machine, containing rolled fingerprints on record at the repository of the State Police; and the machine retrieved a list of respondents having fingerprint similarities to S-12. From the list, Emily Kilcrease (a latent fingerprint analyst employed by the State Police Latent Fingerprint Section who qualified and was accepted by the trial court as an expert in latent fingerprint comparison) identified defendant's known left thumbprint as matching S-12. Sybil Guidry (who works with Kilcrease and who qualified and was accepted by the trial court as an expert in fingerprint analysis comparison) checked and verified the comparison Kilcrease made of defendant's fingerprint. Additionally, at trial, Kilcrease and Guidry compared S-16 (an inked impression of defendant's left thumbprint obtained by Kilcrease at trial) to S-12 and determined that the latent left thumbprint was defendant's.
Officer Michelli told Detective Morris about the matched fingerprint. Morris then went to defendant's home, which was located about four blocks from Dr. Jeansonne's office. Defendant voluntarily accompanied Morris to a police office on Plank Road for questioning. At the office, defendant was advised of his constitutional rights; and, following that advice, defendant denied any knowledge of the robberies. Additionally, defendant stated that he had never been a patient of Dr. Jeansonne, and he had never been inside the doctor's office. On the following day, Morris checked the records of Dr. Jeansonne's patients without finding any record of defendant's name.
Morris then displayed a photographic lineup (consisting of defendant's picture and the pictures of five other individuals) to Tessitora and Dr. Jeansonne. Dr. Jeansonne could not make an identification from the lineup. Tessitora selected two photographs, one of which was defendant's, from the photo array; but, he could not narrow his selection to either picture. The photo lineup was never shown to Mouton. No physical lineup including defendant was ever conducted.
At trial, Tessitora made a positive in-court identification of defendant as the robber who had struck him on the head with the hand-held mirror. Tessitora testified that, when he came to court on the morning of the first day of the trial, he recognized defendant. Tessitora stated the courtroom was full of people and as soon as he saw defendant he recognized him.
Additionally, during Mouton's trial testimony, she made an in-court identification of defendant as one of the two men who *512 had come into Dr. Jeansonne's office inquiring about the gold crowns. Mouton stated that she was certain of the identification.
At trial, defendant took the stand in his own defense. He denied that he committed the instant offenses. According to defendant, the state's witnesses were lying. Defendant stated that State Exhibit S-12 was probably his fingerprint, but that he did not believe it had been lifted from the mirror. According to defendant, the police had obtained his fingerprint from some other source.

SUFFICIENCY OF THE EVIDENCE

(Assignment of error 1)
Defendant contends the evidence is insufficient to support his convictions.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. La.C.Cr.P. art. 821;[2]State v. Captville, 448 So.2d 676 (La.1984).
The state may prove a defendant's guilt by establishing that he was a principal in the crime. La.R.S. 14:24 provides as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
However, all principals are not automatically guilty of the same grade of the offense. State v. Holmes, 388 So.2d 722 (La.1980). Depending upon the mental element proven at trial, a principal may be convicted of a higher or lower degree of the crime. Holmes, 388 So.2d at 726.
Armed robbery and first degree robbery are general intent crimes. State v. Payne, 540 So.2d 520 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989). In general intent crimes, the criminal intent necessary to sustain a conviction is shown by the doing of the acts which have been declared criminal. Holmes, 388 So.2d at 727; Payne, 540 So.2d at 524.
Tessitora testified defendant and his co-perpetrator were armed with guns. Defendant struck Tessitora on his head with the hand-held mirror, which broke, and his co-perpetrator beat Dr. Jeansonne about his head with a gun. The perpetrators took both victims' wallets and fled the scene. Tessitora positively identified defendant as the robber who struck him. The testimony of Kilcrease and Guidry established that the latent fingerprint lifted from one of the broken pieces of the mirror was defendant's fingerprint.
Viewing all the evidence in the light most favorable to the state, any rational trier of fact could have concluded beyond a reasonable doubt that the state proved that defendant directly or as a principal committed the armed and first degree robberies herein.
This assignment of error is without merit.

RECUSAL OF TRIAL JUDGE

(Assignment of error 2)
Defendant contends that Judge Bob H. Hester (the judge to whom the trial court, Judge Frank J. Saia, referred defendant's post-trial motion to recuse) committed reversible error by denying defendant's motion to recuse.
*513 Defendant's appellate counsel filed motions to recuse and for new trial on June 29, 1990. The motion to recuse alleged that the trial court could not fairly and impartially render a decision on the motion for new trial because the trial judge had made an "off the record" statement during the May 8-9, 1990 trial that he "believed" defendant was guilty of the charged crimes.
On the second day of trial before the state resumed the presentation of its case-in-chief, the jury was removed from the courtroom at the request of the public defender who was representing defendant. Out of the jury's presence, defendant asserted he desired to terminate the assistance of the public defender and represent himself for the remainder of the trial. The trial court conducted a Faretta hearing to determine whether or not defendant was knowingly and intelligently exercising his right to self-representation. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); State v. Dupre, 500 So.2d 873 (La.App. 1st Cir.1986), writ denied, 505 So.2d 55 (La.1987). During the Faretta hearing, the trial court made the following statement in response to a comment of a member of defendant's family that defendant was not guilty:
IF IT WAS BEING TRIED TO MEI KNOW HE'S GUILTY BECAUSE HIS FINGERPRINT WAS IN THERE.[3] BUT HE'S BEING TRIED BY A JURY, SEVEN BLACKS AND FIVE WHITES, AND IT'S GOING PRETTY GOOD FOR HIM RIGHT NOW. BUT IF YOU WANT HIM TO FIRE HIS LAWYER AGAINST MY ADVICE AND AGAINST THE LAWYER'S ADVICE, I'LL DO THAT. THAT'S HIS CONSTITUTIONAL RIGHTS [SIC] TO GIVE UP HIS LAWYER, AND I RESPECT THAT, EVEN THOUGH IT'S NOT SMART.
Judge Saia testified at the September 20, 1990 hearing on the motion to recuse. During his testimony, the judge stated that he did not have any bias, prejudice, or personal interest in defendant's trial that would prevent him from fairly and impartially conducting any further proceedings it. The judge stated that, if he had any bias, prejudice, or personal interest, he would voluntarily recuse himself and had, without hesitation, recused himself in the past in other cases. Judge Saia indicated that making the statement was the best way for him to impress upon defendant that the evidence against defendant was great. The judge elaborated he thought defendant was going to be found guilty and he wanted defendant to have the benefit of the assistance of a lawyer to protect his rights and to ensure that the trial proceeded smoothly.
La.C.Cr.P. Art. 671A provides:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(4) Is a witness in the cause;
(5) Has performed a judicial act in the case in another court; or
*514 (6) Would be unable, for any other reason, to conduct a fair and impartial trial.
It is well settled that a trial judge is presumed to be impartial. State v. Spooner, 550 So.2d 1289 (La.App. 1st Cir.1989), writ denied, 566 So.2d 394 (La.1990). For an accused to be entitled to the recusation of a trial judge on grounds of bias, prejudice, and personal interest, such bias, prejudice, and personal interest must be of a substantial nature based on more than mere conclusory allegations. La.C.Cr.P. Art. 671; State v. Edwards, 420 So.2d 663 (La.1982).
The statement at issue, which was not communicated to the jury, is not a ground to recuse the trial judge from hearing and deciding the motion for a new trial. Cf. State v. Tyler, 342 So.2d 574 (La. 1977). Although a trial judge's preconception of the defendant's guilt in a bench trial is probably grounds for recusation, such is not necessarily the case in a jury trial. State v. Littleton, 395 So.2d 730 (La.1981); State v. Manning, 380 So.2d 54, 58 n. 6 (La.1980).
Defendant also intimates in brief that the trial judge should have been recused on two additional grounds: (1) that defendant wanted to call the judge as a witness at the hearing on the motion for new trial, and (2) that the judge's testimony at the hearing on the motion to recuse disclosed that his first cousin was married to Dr. Jeansonne's son.
Defendant's bare assertion that he wanted to call the trial judge as a witness is no more than a mere conclusory allegation without any factual basis and, thus, not a valid basis for recusation. Similarly, the alleged relationship of the trial judge to Dr. Jeansonne is not a valid basis for recusation. Although Judge Saia's first cousin (a relative of his in the fourth degree), is married to the victim's son, that relationship to the victim's son is not one of those constituting a ground for recusation. State v. Daughtery, 563 So.2d 1171 (La. App. 1st Cir.), writ denied, 569 So.2d 980 (La.1990). La.C.Cr.P. art. 671(A)(2), which requires recusation only when the judge is the spouse of the party injured or is related within the fourth degree to the party injured or the spouse of the party injured.
This assignment of error is without merit.

MOTION FOR NEW TRIAL

(Assignment of error 3)
Defendant contends that the trial court committed reversible error by denying his motion for new trial. Defendant asserts he was entitled to a new trial because he was denied effective assistance of counsel at trial. Defendant also appears to argue that he was entitled to a new trial on the basis of newly discovered evidence.

Ineffective Assistance of Counsel
A claim of ineffective counsel is more properly raised by an application for post-conviction relief in the district court where a full evidentiary hearing may be conducted. State v. Bourgeois, 451 So.2d 172 (La. App. 1st Cir.), writ denied, 457 So.2d 18 (La.1984). However, where the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, the issue may be addressed in the interest of judicial economy. State v. Hicks, 554 So.2d 1298 (La.App. 1st Cir.1989), writ denied, 559 So.2d 1374 (La. 1990).
The United States Supreme Court has established a two-part test for review of a convicted defendant's claim that his counsel's assistance was so defective as to require reversal of a conviction. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the court stated:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to *515 deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Herein, the record discloses sufficient evidence to decide the issue of ineffective assistance of counsel raised by defendant. Defendant predicates his claim of ineffective counsel on the basis of the alleged deficient performance of the public defender (who represented him until the beginning of the second and final day of the trial) and his own alleged deficient performance (after he waived his right to counsel and, thereby, elected to rely solely on self-representation for the remainder of the trial). (see defendant's brief at pp. 30, 35, 37, 38)
An accused, who chooses to represent himself, is precluded from complaining on appeal that his self-representation was inadequate. Faretta v. California, 422 U.S. at 834, 95 S.Ct. at 2541, n. 46; State v. Dupre, 500 So.2d at 879, n. 4. Our review of the record of the Faretta hearing convinces us that defendant unequivocally asserted his constitutional right to self-representation. The record reflects that, before accepting defendant's waiver of his constitutional right to counsel, the trial court undertook an adequate process of explanation and inquiry with defendant to assess defendant's literacy, competency, volition, and understanding, and that the court adequately informed defendant of the dangers and disadvantages of representing himself. In light of this, defendant's election to proceed for the remainder of the trial is supported by a knowing and intelligent waiver of defendant's constitutional right to counsel. Accordingly, defendant is now barred from contesting the effectiveness of his self-representation.
The only specific allegation of the public defender's deficient performance relates to an objection made by the public defender during voir dire. The objection was to remarks made by prospective juror number 26 to the trial court. The record reflects that the remarks were made out of the presence of the five jurors who had already been selected, sworn, and impaneled, but in the presence of the remaining prospective jurors yet to be examined. In the remarks, the prospective juror indicated that he was engaged in the grocery store business in Baton Rouge, that he shoots armed robbers, and that "[t]hey're all guilty." Thereupon, defense counsel challenged the prospective juror for cause; and the court sustained the challenge. Thereafter, the court explained to the other prospective jurors that persons selected to the jury had to be fair and impartial and that obviously prospective juror number 26 could not accept the law as given to him by the court. The court emphasized that the defendant is presumed innocent until proven guilty beyond a reasonable doubt, and the court admonished the prospective jurors to disregard the feelings expressed by the excused prospective juror and to inform the court if any of them felt he was unable to give defendant the benefit of the presumption of innocence. The court then recessed for lunch; and, out of the presence of the prospective jurors, defense counsel entered his objection on the basis that juror number 26's remarks were unduly prejudicial and that, thus, the remaining members of the panel of prospective jurors should be excused because of their exposure to the remarks. The trial court initially stated that it would defer ruling on the objection until defense counsel conducted voir dire to determine whether or not the remaining prospective jurors had been prejudiced by the remarks in question. However, immediately thereafter, the court implicitly ruled on the objection by indicating that the admonition cured any problem that might have resulted from the remarks in question. Defendant submits that he was deprived of effective assistance of counsel because defense counsel failed to reurge his objection or to request some further ruling on the original objection. (see defendant's brief at p. 39) Although the record does not disclose that defense counsel reurged his objection or requested any additional ruling, we conclude that it was unnecessary to reurge the objection or ask *516 for any additional ruling. Our examination of the record of the voir dire convinces us that the trial court's admonition and the voir dire of the remaining individuals selected to the jury resulted in the selection of fair and impartial jurors who were not prejudiced by juror number 26's remarks. Hence, defendant has failed to substantiate his claim of ineffective counsel.

Newly Discovered Evidence
Article 851 of the Louisiana Code of Criminal Procedure provides in pertinent part that:
The court, on motion of the defendant, shall grant a new trial whenever: ...
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty....
This rule contains the four generally recognized requisites for the motion for a new trial based on newly discovered evidence: (1) the evidence must have been discovered since the trial; (2) failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) it must be material to the issues at the trial; (4) it must be of such a nature that it would probably produce an acquittal in the event of retrial. State v. Prudholm, 446 So.2d 729 (La.1984).
Defendant presented the testimony of Catrell Gerome Bethley and Meryl Keith Bell, Bethley's brother, to establish an alibi in support of his allegation of newly discovered evidence. The essence of their testimony was that, at the time of the instant offenses, defendant was at a game room (where they were) shooting pool. The state impeached the credibility of both Bethley and Bell on the basis each was currently incarcerated following armed robbery convictions on multiple counts.
Alibi evidence urged on a motion for new trial is not newly discovered if it could have been discovered before or during trial. State v. Prudholm, 446 So.2d at 736. Even were we to assume arguendo that this alibi evidence was newly discovered, it is clearly not of a nature that probably would have produced a different result in this case in which the state's evidence overwhelmingly proved defendant's guilt.
This assignment of error is without merit.

EXCESSIVENESS OF SENTENCE

(Assignment of error 4)
Defendant contends the trial court committed reversible error by imposing excessive sentences. He asserts the sentences are grossly out of proportion to the severity of the offenses and that they amount to needless and purposeless imposition of pain and suffering. Defendant also claims that the trial court failed to adequately comply with the sentencing guidelines in La. C.Cr.P. art. 894.1. Finally, he complains that he was not afforded an opportunity to examine the presentence investigation report.
Excessiveness of a sentence is a question of law which is reviewable. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Hawkins, 496 So.2d 643 (La. App. 1st Cir.1986), writ denied, 500 So.2d 420 (La.1987). A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether or not a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether or not the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980). Maximum sentences are imposed for the most serious violations of the described offense and for the worst kind of offender. State v. Tate, 506 So.2d 546 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987); State v. Leason, 477 So.2d 771 (La.App. 1st Cir. 1985). Because of the wide discretion afforded *517 the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. Payne, 540 So.2d at 524.
A trial court's reasons in imposing sentence, as required by La.C.Cr.P. art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. Hicks, 554 So.2d at 1305. The trial court need not recite the entire checklist found in La.C.Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645 (La.1984). Even when the trial court has not complied with La. C.Cr.P. art. 894.1, this Court need not remand the case for resentencing unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Carr, 530 So.2d 579 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La.1988).
La.R.S. 14:64 provides that armed robbery is punishable by imprisonment at hard labor for a minimum of five and a maximum of ninety-nine years, without benefit of parole, probation or suspension of sentence. La.R.S. 14:64.1 provides that first degree robbery is punishable by imprisonment at hard labor for not less than three years and not more than forty years, without benefit of parole, probation or suspension of sentence. Herein, defendant received the maximum sentence for both offenses; and the court ordered that the sentences run concurrently.
The record reflects that the trial court ordered a presentence investigation report. Defendant, just as any defendant, has a right of access to the presentence investigation report, but he must timely request access to the report and, in the event of denial of such a request, must show that the report relied upon by the trial court contained false information prejudicial to him. State v. Boone, 364 So.2d 978 (La.1978); State v. Cushman, 481 So.2d 1376 (La.App. 5th Cir.), writ denied, 486 So.2d 748 (La.1986). See also State v. McGhee, 554 So.2d 145 (La.App. 2nd Cir. 1989). Contrary to defendant's assertion, the record fails to reflect that defendant ever requested access to the report; absent such a request, defendant is deemed to have waived his right to access to the report. McGhee, 554 So.2d at 147-148.
The presentence investigation report discloses defendant was born on December 4, 1970, and he is classified as a first felony offender. However, notwithstanding his youth, the report reflects defendant had several felony arrests, in addition to his arrest for the instant offenses.
At sentencing, the court undertook a review of defendant's arrest record as an adult. The court noted that, on December 31, 1988, defendant was arrested for simple burglary of an inhabited dwelling and less than one month later, on January 26, 1989, he was arrested for another simple burglary of an inhabited dwelling. Defendant was arrested for aggravated battery on March 26, 1989, prior to his arrest for the instant offenses on June 9, 1989. The trial court then articulated the following additional reasons for sentencing:
THE DEFENDANT PILED UP A CRIMINAL ARREST RECORD, CRIMINAL ACTIVITY IN A SHORT PERIOD OF TIME. OF COURSE, HE'S ONLYAT THE TIME OF THESE OFFENSES, HE WAS JUST 18. HE DIDN'T HAVE MUCH TIME TO BUILD UP A RECORD. I'M SURE THAT GIVEN TIME HE WOULD HAVE BUILT A SIGNIFICANT CRIMINAL HISTORY AND ONE OF CRIMES OF VIOLENCE, THEFT, CRIMES AGAINST PROPERTY AND PERSON. HE'S OBVIOUSLY A DANGER TO THE SOCIETY. HE'S A MENACE TO SOCIETY. HE NEEDS TO BE INCARCERATED. HE NEEDS CORRECTIONAL TREATMENT THAT CAN ONLY BE OBTAINED THROUGH A HARD LABOR PENITENTIARY. HE CERTAINLY WOULD LIKELY COMMIT A CRIME IF HE WAS GIVEN PROBATION. HE WOULD NOT RESPOND AFFIRMATIVELY TO PROBATION. THIS IS AN ARMED ROBBERY WITH A PISTOL, WITH SIGNIFICANT AGGRAVATING CIRCUMSTANCES. HE WAS FOUND GUILTY OF ARM-ROBBING TWO ELDERLY GENTLEMEN AT GUNPOINT WITH THE HELP OF AN UNKNOWN ACCOMPLICE. HE HAS YET TO SHOW *518 ANY REMORSE AND CONTINUES TO COMPLAIN ABOUT THE SYSTEM. BUT THE SYSTEM FOUND HIM GUILTY. A 12-MEMBER JURY FOUND HIM GUILTY OF AN ARMED ROBBERY AND A FIRST DEGREE ROBBERY. THE VICTIMS WERE BEATEN. THEY WERE TOLD TO LAY DOWN. THEY WERE FRIGHTENED. THEY WERE HELPLESS IN THAT THEY SAW THEM COMING IN, HAD NO WAY TO PREVENT THIS ROBBERY OTHER THAN FIGHTING FOR THEIR LIVES. ONE OF THE ELDERLY VICTIMS HAS SINCE DECEASEDIS SINCE DECEASED.
The trial court adequately complied with the sentencing guidelines in La.C.Cr.P. art. 894.1. Due to the particularly heinous circumstances of the instant offenses, they clearly fall within the category of the most serious violations of armed robbery and first degree robbery and show that defendant is one of the worst offenders. The sentences imposed are not grossly disproportionate to the severity of the crimes, in light of the harm to society, or so disproportionate as to shock our sense of justice. These sentences are not excessive.
This assignment of error is without merit.[4]

DECREE
For the foregoing reasons, the convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The record reflects that Dr. Jeansonne died about two or three months before the instant trial, which was held on May 8-9, 1990.
[2] Defendant asserts that, because the state's case against him was based in part on circumstantial evidence, the rule regarding the use of circumstantial evidence set forth in La.R.S. 15:438 was applicable in this case. (See p. 32 of defendant's brief) La.R.S. 15:438 provides that: "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." However, see State v. Lilly, 468 So.2d 1154 (La.1985); State v. Chism, 436 So.2d 464 (La.1983); State v. Guirlando, 491 So.2d 38, 40 (La.App. 1st Cir. 1986). The state introduced direct evidence proving every element of the crimes for which defendant was convicted.
[3] The record reflects that the trial judge presided at defendant's September 15, 1989 preliminary hearing. At that hearing, the state presented Detective Morris' testimony that one of the latent fingerprints lifted from the broken mirror positively matched defendant's fingerprint. Although evidence that the fingerprints matched had not been presented at trial when the trial court made the statement that defendant was guilty because of the presence of his fingerprint (on the piece of mirror), the court had already been exposed to that evidence at the preliminary hearing.
[4] Defendant briefed two additional arguments not formally assigned as error. In these arguments, defendant asserts (1) that the photographic lineup which included his picture was suggestive, that there was a likelihood of misidentification as a consequence of the photographic lineup procedure (See p. 14 of defendant's brief) and (2) that Louisiana Code of Criminal Procedure Article 674 relating to the recusation of a trial judge is unfair and unconstitutional as applied to defendant. (See p. 22 of defendant's brief) However, in accord with the well-established jurisprudence of the Louisiana Supreme Court under the provisions of La. C.Cr.P. arts. 844 and 920, this Court will not consider any arguments such as those set forth above which are neither assigned as errors nor related to errors patent on the face of the record. See State v. Spears, 350 So.2d 603, 605 n. 1 (La.1977); State v. Overton, 337 So.2d 1201, 1207 (La.1976).

Additionally, defendant makes a general request, without alleging any specific error, that this Court examine the record for errors patent. (See defendant's brief at p. 25) Such a request serves no purpose, since this Court routinely examines all criminal appellate records for errors patent in accordance with La.C.Cr.P. Art. 920(2). Herein, our review discloses no such errors.