# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-218

STATE OF LOUISIANA

VERSUS

ROBERT S. WILLIS

**********
APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CATAHOULA, NO. 01-0983(A) AND 01-1112
HONORABLE LEO BOOTHE, DISTRICT JUDGE

**********
## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

**PICKETT, J., DISSENTS IN PART AND WOULD AFFIRM THE CONVICTIONS FOR FORCIBLE RAPE.**

> **AFFIRMED IN PART; REVERSED IN PART. CONVICTION AND SENTENCE FOR AGGRAVATED RAPE AFFIRMED. CONVICTIONS FOR FORCIBLE RAPE FOR THE YEARS 1992, 1993, AND 1994 VACATED; JUDGMENTS OF GUILTY OF SEXUAL BATTERY FOR THE YEARS 1992, 1993, AND 1994 ENTERED AND CASE REMANDED FOR SENTENCING. CONVICTION FOR FORCIBLE RAPE FOR 1995 VACATED AND JUDGMENT OF ACQUITTAL ENTERED.**

John Frederick Johnson
District Attorney - 7th Judicial District Court
Bradley Rex Burget
Assistant District Attorney
4001 Carter Street - Suite 9
Vidalia, LA 71373
Telephone: (318) 336-5526
COUNSEL FOR:
    Plaintiff/Appellee - State of Louisiana

**L. J. Hymel, Jr.**
**Judge, 19th Judicial District Court**
**222 St. Louis Street**
**Baton Rouge, LA 70801**
**COUNSEL FOR:**
 **Defendant/Appellant - Robert S. Willis**

**Michael Reese Davis**
**Stephen H. Shapiro**
**Sharp, Hymel, Cerniglia, Colvin, Weaver & Davis, L.L.C.**
**15171 South Harrel's Ferry Road**
**Baton Rouge, LA 70816**
**Telephone:  (225) 755-1060**
**COUNSEL FOR:**
 **Defendant/Appellant - Robert S. Willis**

THIBODEAUX, Chief Judge.

The Defendant, Robert Willis, appeals his convictions for aggravated rape for which he received a mandatory life sentence and four counts of forcible rape for which he received a forty-year sentence on each count, consecutive to each other and consecutive to the life sentence. He asserts twelve assignments of error, including insufficiency of the evidence.

For the following reasons, we affirm the Defendant's conviction and sentence for aggravated rape, vacate the Defendant's convictions of forcible rape for the years 1992, 1993, and 1994, and enter judgments of guilty of sexual battery for the years 1992, 1993, and 1994. We remand for sentencing on these convictions. Finally, because of insufficiency of the evidence, we vacate the Defendant's conviction for forcible rape for the year 1995.

**Insufficiency of the Evidence**

The Defendant contends the evidence presented was insufficient to support the jury's verdict. *State v. Hearold*, 603 So.2d 731 (La.1992) stated that, because a finding of insufficient evidence may result in an outright acquittal, sufficiency challenges should be addressed before other claims.

In reviewing the sufficiency of the evidence to support a conviction,

> [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. *State v. Captville*, 448 So.2d 676, 678 (La.1984).

*State v. Williams*, 03-3514, p. 5 (La. 12/13/04), 893 So.2d 7, 12.

1

The Defendant was convicted of one count of aggravated rape and four counts of forcible rape.  At the time of the offenses, aggravated rape was defined as follows:

> A.  Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
>
> (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
>
> (3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
>
> (4) When the victim is under the age of twelve years.  Lack of knowledge of the victim's age shall not be a defense.
>
> (5) When two or more offenders participated in the act.

La.R.S. 14:42.

At the time of the offenses, forcible rape was defined as follows:

> a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

La.R.S. 14:42.1.

2

J. W.[1] had two children, C.M., born January 10, 1980, and R.M., born January 28, 1978. J.W. met the Defendant in June of 1990, and he moved in with her family during the first part of 1991. The two were married on March 3, 1994.

**OFFENSES INVOLVING C.M.**

During 1990, for a period of eight to nine months, the Defendant told C.M. to feel the knife in his pocket and forced her hands between his legs. This abuse progressed and, in 1991, the Defendant had sexual intercourse with C.M., who was eleven years old. C.M. testified that she did not voluntarily participate in this sex act and was held down by the Defendant. When asked how many times this act occurred in 1991, C.M. testified that she could not count the number and "[t]his was every day." During sexual intercourse, the Defendant would choke C.M. until she lost her breath. Additionally, the Defendant threatened to kill her if she told her mother what occurred.

J.W. became aware of the sexual activity when C.M. was twelve as this activity began to occur in J.W.'s presence. According to C.M., J.W. began to purchase condoms for the Defendant's use when having sex with her when she was eleven or twelve, which would have been in 1991 or 1992; however, J.W. testified that this practice began in 1992 or 1993.

Eventually, C.M. began sleeping in bed with the Defendant and J.W. The Defendant then had sex with C.M. in J.W.'s presence and with J.W. in C.M.'s presence. C.M. participated in sex with her mother, J.W., once when the two performed oral sex upon each other. C.M. could not recall the date of this incident, but J.W. testified that this act occurred on March 3, 1994, the day she married the

---

[1]In accordance with La.R.S. 46:1844(W), the initials of the victim and those of certain family members are used throughout this opinion.

Defendant.[2]  When asked if she agreed to perform a sexual act upon her mother, C.M. testified that she had no choice.  She explained that the Defendant threatened to kill her if she refused to cooperate and that she feared him because he had beaten both her and her mother.  C.M. also testified that she was constantly reminded not to tell anyone what was happening to her and that if she reported the incidents she would be killed.

While on vacation in 1994, C.M., who was fourteen, discovered she was pregnant with the Defendant's child.  Defendant and J.W. took C.M. to Baton Rouge where she had an abortion.

The Defendant ceased having sex with C.M. in late 1995, when she was fifteen years old.  C.M. reported these events to police on April 4, 2001.

The above testimony is the only direct evidence the State presented regarding sexual intercourse between C.M. and the Defendant.  In its closing argument, the State indicated that it relied upon proof of *other beatings* to satisfy the force element of the forcible rape offenses.

## BEATINGS AND OTHER MALTREATMENT

C.M. testified that the Defendant once beat her with a bull whip and threatened her with a gun when he thought he contracted a rash from her because she was having sex with boys at school.  Although there was no testimony regarding the date of this incident, C.M. was home schooled after she completed the seventh grade.  J.W. testified that C.M. was taken out of school in 1993 or 1994.

C.M. witnessed the Defendant kick, stomp, and punch J.W.  C.M. testified that the Defendant badly beat J.W. twice and other times he would hit and

---

[2]As a result of her actions, J.W. pled guilty to one count of aggravated oral sexual battery on October 12, 2002.  At the time of trial, she had not been sentenced.

slap her. C.M. testified that she could not count the number of times she witnessed the Defendant hit J.W.

C.M. testified that on one occasion the Defendant returned from hunting and he and J.W. argued. During that incident, the Defendant threw J.W. down and kicked, stomped, and hit her. The Defendant then dragged J.W. into the house. When C.M. tried to stop the Defendant, he hit her, splitting her lip. Once C.M. and J.W. were on the floor, the Defendant took out his pocket knife and told them he would rather see them lying by C.M.'s father, who was deceased, than to look at them. During this episode, the Defendant also beat a gun over a chair until the chair and the gun were broken. J.W. corroborated this testimony, indicating this incident occurred while she worked at Four Rivers Home Care. Although J.W. did not testify as to what time period she was employed at Four Rivers Home Care, R.M. testified this incident occurred in 1993. During another altercation, C.M. saw the Defendant put J.W. in a headlock and hit her in the stomach.

C.M. also saw the Defendant beat R.M. She indicated this occurred "pretty often" until R.M. moved out. J.W. also testified that the Defendant physically and verbally abused R.M. R.M. testified that while he hunted with the Defendant, the two sometimes fought and the Defendant would give him a knot on the head. R.M. moved out the day after the incident in 1993.

J.W. testified that the Defendant began to use force or violence against her in the latter part of 1990 and that this was a routine practice from 1991 until March 1999. J.W. further testified that she was beaten by the Defendant "pretty often." When asked to explain what that meant, she stated "it didn't have any particular scheduling. It would be like maybe one week and then it may be okay for a couple of weeks and then it would happen again."

5

One winter the Defendant returned from hunting and hit J.W. and C.M. with his fists. During that altercation, J.W. instructed C.M. to run to the neighbor's house for protection. J.W. did not testify as to what year this event took place.

J.W. further testified that after the Defendant moved into the home, she placed padlocks on the bedroom doors of C.M. and R.M. because the Defendant told her C.M. and R.M. were having sex. R.M. testified that he was not told why padlocks were put on his door. R.M. indicated the locks were put on in 1997 or 1998. Neither C.M. nor J.W. testified regarding the date the locks were installed. C.M. testified that the Defendant accused her of having sex with her brother and she went out of her way to avoid her brother. However, R.M. testified that he was not aware of any prohibition against C.M. looking at him.

C.M. was shown several pictures of the family home that depicted padlocks on her bedroom door and that of R.M. Additionally, C.M. identified photographs reflecting holes in the wall of the home. She testified the holes were the result of the Defendant pushing R.M. into the wall.

Robbie Edwards testified that his home was approximately one hundred yards from the Willis home. It appeared to him that C.M. was not allowed to go anywhere after the Defendant moved in. While the Defendant resided with J.W., Mr. Edwards saw J.W. and her face was beaten to the point that he barely recognized her. On another occasion, C.M. went to his residence saying that the Defendant "was on her and her mother" and she wanted a safe place to go. Mr. Edwards later testified that he did not remember when these events occurred.

Angie Lancaster worked with J.W. for approximately two years, from "maybe 1995 to 1998." Ms. Lancaster testified that the week that J.W. and the Defendant were married, J.W. had two black eyes and was holding her side. On two or three other occasions, J.W. wore sunglasses to hide black eyes. One occasion was

6

prior to J.W.'s wedding, and the others occurred later. Ms. Lancaster did not testify as to who beat J.W. Ms. Lancaster further testified that C.M. appeared to be insecure and afraid of men. She would "hug up against" the wall when a male employee passed her in the hall. Ms. Lancaster guessed that C.M. was fourteen or fifteen at that time. Ms. Lancaster did not testify as to the reason for C.M.'s insecurity. Ms. Lancaster testified that, less than one year after J.W. married the Defendant, she gave J.W. and C.M. a place to stay so the Defendant would not find them.

Several witnesses, including James Poole, Travis Pritchard, Buster Reed, and Robbie McMillin, testified they never observed any bruises that would indicate that J.W. and her children had been abused, nor had they ever seen the Defendant physically abuse anyone.

## PAST VICTIMS

During the State's case-in-chief, it called two sisters, Charlotte Lockwood and Judy Chisom, to testify regarding acts committed upon them by the Defendant. Additionally, the State submitted evidence that the Defendant entered a plea of guilty to three counts of carnal knowledge of a juvenile and one count of indecent behavior with a juvenile on October 19, 1981. However, two of the Defendant's three convictions for carnal knowledge of a juvenile were set aside by the trial court in 1985, when his application for post-conviction relief was granted in part.

Ms. Lockwood testified that when she was four years old the Defendant began to touch her and perform oral sex upon her, and she was made to touch his penis. The Defendant began having sexual intercourse with her when she was approximately ten years old. If Ms. Lockwood refused to have sex with the Defendant, he would beat her and her family. Eventually Ms. Lockwood started

7

sleeping in bed with the Defendant and her mother, and the Defendant would have sex with both her and her mother. Additionally, the Defendant attempted to have Ms. Lockwood's mother perform oral sex upon her, but her mother refused. Ms. Lockwood testified that the Defendant had sexual intercourse and oral sex with all her brothers and sisters. Additionally, the Defendant shot at her mother, hung her mother from a tree, and all members of the family had black eyes and bruises at various times.

Ms. Lockwood became pregnant when she was thirteen and had the Defendant's child at age of fourteen. At one point, the Defendant threatened to beat Ms. Lockwood while she was pregnant because he thought she was having sex with her brother. In 1978, Ms. Lockwood ran away with her baby. She returned home and married the Defendant in November 1979 because he told her he would stop abusing her sister if she did so.

Ms. Chisom testified that when she was five or six the Defendant told her and her sisters to feel the knife in his pocket. However, the girls were actually rubbing the Defendant's penis. On March 3, 1971, the Defendant performed oral sex on Ms. Chisom and her sisters and made them perform oral sex on him. If Ms. Chisom refused to perform oral sex on the Defendant, he would slap her and, if she continued to say no, the Defendant would beat the entire family. Ms. Chisom testified that the Defendant first had sexual intercourse with her ten days after her twelfth birthday.

Between the time of Ms. Chisom's first sexual encounter with the Defendant on September 24, 1976 until the time Ms. Lockwood left in 1978, Ms. Chisom had sexual intercourse with the Defendant at least twice a week. Once when Ms. Chisom was fifteen, she refused to have sex with the Defendant and he slapped

her, hit her, and choked her until she became unconscious. After Ms. Chisom came to, the Defendant performed oral sex on her and made her perform oral sex on him.

Ms. Chisom testified that after Ms. Lockwood ran away from home, the Defendant tore up the house, set it on fire, then made the children put out the fire. Ms. Chisom slept in the Defendant's bed until Ms. Lockwood's return. Ms. Chisom's mother told her that if she did not sleep with the Defendant, he would kill the family.

## DEFENSE

At trial, the Defendant attempted to persuade the jury that C.M., who knew about the Defendant's prior convictions, fabricated the allegations of sexual abuse because the Defendant and J.W. got C.M.'s partner fired from her job. The Defendant also attempted to persuade the jury that J.W.'s brother, Jerry Rainey, assisted C.M. because he wanted to put the Defendant's competing company out of business. Additionally, he asserted the only reason J.W. testified against the Defendant and entered a guilty plea was so she would spend less time in jail.

C.M. married Calvin Deason on February 19, 2000. In December 2000, she went to work at Wal-Mart. While there, she met Tess Desourmeaux, her supervisor. C.M. separated from Mr. Deason in February 2001 in order to be with Ms. Desourmeaux. Mr. Deason told the Defendant and J.W. that C.M. was involved in a relationship with Ms. Desourmeaux. C.M. then reunited with Mr. Deason and, at the request of the Defendant and J.W., filed a sexual harassment claim against Ms. Desourmeaux. C.M. later recanted her story of sexual harassment and J.W. filed a complaint with Wal-Mart. As a result of J.W.'s complaint, Ms. Desourmeaux was fired. C.M. told J.W. she would get even with her someday for getting Ms. Desourmeaux fired.

C.M. went to work for Jerry Rainey, J.W.'s brother and the Defendant's business competitor in March 2001. After C.M. went to work for Mr. Rainey, she told him of the abuse she suffered at the hands of J.W. and the Defendant. C.M. testified that she had known about the Defendant's prior convictions since she was twelve, but she did not tell Mr. Rainey about the Defendant's past and he never spoke of the matter in her presence. However, R.M. testified that a letter from one of the Defendant's prior victims was faxed to Mr. Rainey's business. R.M. did not know if it was C.M. or Mr. Rainey that had been in contact with them. However, he was sure that Mr. Rainey read the fax.

Eula Deason, Calvin Deason's mother, testified that C.M. told her she had spoken to one of the Defendant's prior victims and C.M. believed "it happened like the girl told her." This conversation occurred while C.M. was working at Wal-Mart, which would have been after December 2000.

During her stay in jail, J.W. maintained her innocence. She wrote and received letters from the Defendant daily, and the two spoke on the phone three times a day. Although she told her doctors, counselors, and the Defendant's attorneys that she was falsely accused, J.W. entered a plea of guilty to one count of aggravated oral sexual battery.

## LAW AND DISCUSSION

On appeal, the Defendant argues there was insufficient evidence to convict him of the offenses. The Defendant contends that C.M. and J.W. were not credible. He points out J.W.'s prior proclamation that she was falsely accused, the fact that J.W. was upset that C.M. was a lesbian, and that C.M. was angry at J.W. and the Defendant for getting her partner fired. He also asserts that the Defendant's business competitor, Jerry Rainey, was driving the prosecution in order to eliminate

the Defendant as a business competitor. Additionally, the Defendant points out that J.W. testified that she had sex with C.M. on only one occasion, whereas C.M. testified this occurred more than once. The Defendant also alleges that C.M.'s testimony regarding the date the offenses began to occur was inconsistent and that C.M. testified inconsistently regarding the date that her sexual relationship with her female lover began. Additionally, he contends that C.M. did not report the abuse until she became angry at the Defendant and J.W., told them she would get even with them, and began to work for the Defendant's competitor.

In order to convict the Defendant of aggravated rape the State must prove the Defendant had sexual intercourse with C.M. when she was under the age of twelve. La.R.S. 14:42. C.M.'s testimony revealed the Defendant had sexual intercourse with her in 1991, when she was eleven years old. Accordingly, a reasonable trier of fact could conclude that the elements of aggravated rape were proven beyond a reasonable doubt.

In order to convict the Defendant of each count of forcible rape, the State had to prove: (1) an act of vaginal or anal intercourse; (2) lack of consent of the victim; (3) the victim was prevented from resisting the act by force or threats of physical violence; and (4) the victim reasonably believed that such resistance would not prevent the rape. La.R.S. 14:42.1; *State v. Schexnaider,* 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450.

The Defendant was charged with one count of forcible rape for each year from 1992 through 1995. C.M. testified that the Defendant had sex with her from 1991 to 1995. There were no details regarding the number of times the Defendant had sexual intercourse with C.M. or the dates that these offenses occurred, with the exception of the testimony regarding March 3, 1994. C.M. testified that J.W. began

11

to buy condoms for the Defendant's use in 1991 or 1992 and J.W. testified that this began in 1992 or 1993.

The State failed to prove that C.M. did not consent to sexual intercourse with the Defendant, that the Defendant's acts of force or threats of physical violence prevented her from resisting the act, and that she reasonably believed that such resistance would not prevent the rape.

The State relied upon evidence that the Defendant beat C.M. and her family members to support the elements of forcible rape. In its opening statement, the State informed the jury that the Defendant committed forcible rape and explained that forcible rape was sexual intercourse by "force or violence or threats of force or violence or reoccurring implied threats of force or violence." In its closing argument, the State made the following comments:

> What happened to [C.M.]? Constantly getting beat. Mom getting beat. If she didn't submit. He had sex with her from the time she was eleven years old until the time she was sixteen. Did she fight him or resist him every time? No. Not every time. Because she knew if she resisted, she was going to be beaten.

There was no direct evidence that either J.W. or C.M. was beaten constantly. J.W. testified that the Defendant beat her on a regular basis, which she indicated might mean she would be beaten one day, then again two weeks later. The evidence showed the Defendant beat C.M. twice, once when he thought she was having sex with boys from school and a second time when she got involved in an altercation he was having with J.W. Furthermore, there are no exact dates in the record regarding beatings received by C.M. or J.W. Also, none of the beatings discussed in the record occurred prior to or after a sexual act between C.M. and the Defendant or because of C.M.'s refusal to participate in a sexual act with the Defendant. C.M. did testify that she performed oral sex upon her mother because if

she refused the Defendant would beat her. This comment was in reference to a refusal to perform a sexual act by C.M. upon her mother and had nothing to do with a sexual act involving the Defendant.

The State brings out the fact that padlocks were placed on C.M.'s door. However, J.W. placed the padlocks on the bedroom doors of her children. The only testimony regarding the dates the locks were placed on the bedroom doors was by R.M. who indicated this was done in 1997 or 1998, which was after the Defendant stopped having sexual intercourse with C.M.

C.M. was never asked whether she consented to have sexual intercourse with the Defendant, why she had sexual intercourse with the Defendant, or if she was afraid the Defendant would beat her if she refused to have sexual intercourse with him. Viewing the evidence in the light most favorable to the prosecution, the State failed to prove the elements sufficient to support the Defendant's four convictions for forcible rape.

Under La.Code Crim.P. art. 821(C), "an appellate court that finds 'the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense . . . may modify the verdict and render a judgment of conviction on the lesser included responsive offense.'" *State v. Teague*, 04-1132, p. 9 (La.App. 3 Cir. 2/2/05), 893 So.2d 198, 205. We must, therefore, determine whether any responsive offense was proven.

Sexual battery is a responsive offense to forcible rape. La.Code Crim.P. art. 814(A)(10). At the time of the offenses, sexual battery was defined as follows:

> A. Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender acts without the consent of the victim, or where the other person has not yet attained fifteen years of age and is at least three years younger than the offender:

> (1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
>
> (2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.

La.R.S. 14:43.1. Accordingly, the State had to prove beyond a reasonable doubt that the Defendant touched the anus or genitals of C.M. using any part of his body and this occurred when C.M. was under the age of fifteen.

C.M. testified that the Defendant had sexual intercourse with her on a continual basis from 1991 to 1995. Accordingly, the State proved the Defendant touched C.M.'s genitals with a part of his body. C.M. turned fifteen on January 10, 1995. Therefore, she was under the age of fifteen when the offenses in 1992, 1993, and 1994 were committed. The Defendant's age was not an element of the offenses of aggravated rape or forcible rape. Consequently, no testimony regarding the Defendant's age was presented. However, the Defendant's age at the time of his daughter's birth in 1977 appears on that child's birth certificate, which was submitted into evidence. State exhibit 10 lists the Defendant's age as thirty on December 14, 1977. Accordingly, at the time of the offenses, the Defendant was more than three years older than C.M. Therefore, the State proved that C.M. was under the age of fifteen and the Defendant was three years older than her when the offenses in 1992, 1993, and 1994 were committed. Accordingly, the evidence, when viewed in the light most favorable to the prosecution, establishes that the Defendant committed sexual battery against C.M. in 1992, 1993, and 1994. Therefore, a reasonable trier of fact could conclude that the evidence warrants convictions for sexual battery occurring in 1992, 1993, and 1994.

C.M. turned fifteen on January 10, 1995. Whether any sexual acts were committed by the Defendant upon C.M. between January 1, 1995 and January 10, 1995 is not demonstrated by the evidence. Although there was testimony that the Defendant had sexual intercourse with C.M. on a continual basis, that is not sufficient to prove that the Defendant had sexual intercourse with C.M. during that time period. Additionally, the State would have to prove that any sexual intercourse that occurred in 1995 was without the consent of C.M. The State failed to ask C.M. if she voluntarily had sexual intercourse with the Defendant in 1995. The only evidence regarding this issue was C.M.'s testimony that she did not voluntarily have sex with the Defendant in 1991. Accordingly, the State failed to prove that the Defendant committed an offense in 1995. The Defendant's conviction for forcible rape occurring in 1995 is vacated.

Although the Defendant points out inconsistencies in the testimony of C.M. and J.W., the jury's verdict indicates that it believed the testimony of C.M., notwithstanding any inconsistencies in the testimony presented at trial. Additionally, "[t]he credibility of a witness, including the victim, is within the discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. '[T]he *Jackson* standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial.'" *Schexnaider*, 852 So.2d at 457 (citations omitted), *quoting State v. Williams*, 00-981, p. 7 (La.App. 5 Cir. 4/11/01), 786 So.2d 805, 810, *writ denied*, 01-1377 (La. 3/20/02), 812 So.2d 646. Furthermore, the testimony of the victim alone is sufficient to establish the elements of a sexual offense. *Id.*

15

**Retroactive Application of La.Code Evid. art. 412.2**

The Defendant contends the trial court's retroactive application of La.Code Evid. art. 412.2 violated the *ex post facto* clause.

At the time the offenses at issue were committed, La.Code Evid. art. 404(B) governed the admissibility of evidence regarding other crimes, wrongs, or acts. In 2001, the legislature enacted Article 412.2.[3] The Defendant contends the application of this article to his case was a violation of the *ex post facto* clause. At the time of the Defendant's trial, Article 412.2 provided as follows:

> A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another sexual offense may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

> B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.

> C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.

The Louisiana Supreme Court has not decided whether the retroactive application of Article 412.2 is a violation of the *ex post facto* clause. In footnote two of *State v. Morgan*, 02-3196 (La. 1/21/04), 863 So.2d 520, the supreme court noted

---

[3]The Louisiana legislature enacted La.Code Evid. art. 412.2 after the supreme court decisions in *State v. McArthur*, 97-2918 (La. 10/20/98), 719 So.2d 1037, *superceded by statute as stated in State v. Brown*, 03-1747 (La.App. 3 Cir. 5/12/04), 874 So.2d 318, *writ denied*, 04-1413 (La. 11/8/04), 885 So.2d 1118, and *State v. Kennedy*, 00-1554 (La. 4/3/01), 803 So.2d 916, *superceded by statute as stated in State v. Zornes*, 34,070 (La.App. 2 Cir. 4/3/02), 814 So.2d 113, *writ denied*, 02-1280 (La. 11/27/02), 831 So.2d 269. In *McArthur*, the supreme court held that evidence of a prior sexual assault involving an adult was inadmissible under the "lustful disposition" exception of La.Code Evid. art. 404(B). In *Kennedy*, the supreme court held that aggravated rape was a general intent crime; therefore, the only issue pertinent was whether penetration occurred. As the evidence regarding other crimes did not bear upon an essential element of the offense, it was inadmissible.

that the retroactive applicability of Article 412.2 "remains an open question." *Id*. at 521. However, we conclude the retroactive application of Article 412.2 does not constitute a violation of the *ex post facto* clause.

The United States Supreme Court has interpreted the *ex post facto* clause of the United States Constitution as prohibiting four types of laws. In *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620 (2000), the court cited *Calder v. Bull*, 3 U.S. 386, 390 (1798), listing the four types of *ex post facto* laws as follows:

> "1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*" *Id*., at 390 (emphasis in original).

*Carmell*, 529 U.S. at 522, 120 S.Ct. at 1627. The court also stated that it has "repeatedly endorsed this understanding, including, in particular, the fourth category." *Id.* at 525, 120 S.Ct. at 1629.

Louisiana Constitution Article 1, § 23 also prohibits the enactment of any *ex post facto* law. In *State ex rel. Olivieri v. State*, 00-172, 00-1767 (La. 2/21/01), 779 So.2d 735, *cert. denied*, 533 U.S. 936, 121 S.Ct. 2566 (2001), the Louisiana Supreme Court followed the current federal approach to the *ex post facto* analysis and held that the basis of the analysis should be whether the law alters the definition of criminal conduct or increases the penalty and not whether the change in a law operates to the disadvantage of an individual. *Id*. The court stated in footnote twenty that its exclusion of the fourth category set out in *Calder*, 3 U.S. 386, should not be interpreted as a rejection of that category. *Olivieri*, 779 So.2d at 735.

The Defendant argues that Article 412.2 is an *ex post facto* law of the fourth federal category. In *Carmell*, 529 U.S. at 532-33, 120 S.Ct. at 1632-33 (footnote omitted), the Supreme Court affirmed the use of the fourth *ex post facto* category and declined to limit its application to statutes that alter the burden of proof, explaining:

> A law reducing the quantum of evidence required to convict an offender is as grossly unfair as, say, retrospectively eliminating an element of the offense, increasing the punishment for an existing offense, or lowering the burden of proof (see *infra*, at 1636-1639). In each of these instances, the government subverts the presumption of innocence by reducing the number of elements it must prove to overcome that presumption; by threatening such severe punishment so as to induce a plea to a lesser offense or a lower sentence; or by making it easier to meet the threshold for overcoming the presumption. Reducing the quantum of evidence necessary to meet the burden of proof is simply another way of achieving the same end. All of these legislative changes, in a sense, are mirror images of one another. In each instance, the government refuses, after the fact, to play by its own rules, altering them in a way that is advantageous only to the State, to facilitate an easier conviction.

Additionally, the Court mentioned that it does not distinguish between statutes that are procedural or substantive. The Court stated:

> The better understanding of *Collins'* discussion of the *Ex Post Facto* Clause is that it eliminated a doctrinal hitch that had developed in our cases, which purported to define the scope of the Clause along an axis distinguishing between laws involving "substantial protections" and those that are merely "procedural." Both *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), and *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898)--the two cases *Collins* overruled--relied on just that distinction. In overruling them, the Court correctly pointed out, "the prohibition which may not be evaded is the one defined by the *Calder* categories." 497 U.S. at 46 [110 S.Ct. 2715]. Accordingly, *Collins* held that it was a mistake to stray *beyond Calder's* four categories, not that the fourth category was itself mistaken.

*Id.* at 539, 120 S.Ct. at 1636 (citing *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715 (1990)).

18

This court must determine whether the application of Article 412.2 to this case required the State to present less or different testimony than the law required at the time the offenses at issue were committed. The Defendant argues that the admission of evidence pursuant to Article 412.2 significantly relaxed the standard under which prior sex crimes and alleged acts may be admitted and the admission of such evidence is likely to "predispose the jury into believing that the defendant committed the crime for which he is presently on trial, rather than evaluating the present facts and rendering a verdict based on those facts." The Defendant contends this effectively lowers the State's burden of proof and allows for the presentation of evidence vastly different than that allowed when the offenses were committed. Accordingly, the Defendant argues the admission of evidence pursuant to Article 412.2 violates the *ex post facto* clause.

The State contends the supreme court allowed evidence of an accused's commission of other sexual offenses prior to the effective date of Article 412.2 in *State v. Williams*, 02-898, 02-1030 (La. 10/15/02), 830 So.2d 984. In *Williams*, the offenses at issue did occur prior to the enactment of Article 412.2. However, the issue presented to the court was whether the requirements of *State v. Prieur*, 277 So.2d 126 (La.1973), were applicable to Article 412.2. The court was not called upon and did not address the retroactive application of Article 412.2.

We recognize that jurisprudence from other states is not binding upon us. We refer to it for instructive and persuasive purposes only. For example, in *McCulloch v. State*, 39 S.W.3d 678 (Tex.App.-Beaumont 2001), the defendant was convicted in January 2000 of aggravated sexual assault of his stepdaughter. The offense occurred in August 1988 and was reported to police in November 1997. Between the time of the alleged offense and the time of trial, the Texas legislature enacted Article 38.37 of its Code of Criminal Procedure which provided that:

19

evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense . . . shall be admitted for its bearing on relevant matters, including:

> (1) the state of mind of the defendant and the child; and

> (2) the previous and subsequent relationship between the defendant and the child.

*Id*. at 679. Pursuant to Article 38.37, the state offered evidence of other sexual assaults committed by the defendant against the victim before and after the charged offense. On appeal, the defendant argued that the application of Article 38.37 in his case was a violation of the *ex post facto* clause of the United Sates Constitution. The defendant specifically alleged that Article 38.37, as it was enacted after the charged offense was committed, altered the legal rules of evidence and required less or different testimony than the law required at the time of the commission of the offense. The defendant cited *Carmell*, 529 U.S. 513, in support of his argument.

The court found that *Carmell* was distinguishable, indicating that the statute in *Carmell* "defined the evidence by which a conviction was 'supportable.'" *McCulloch*, 39 S.W.3d at 683. The court noted that Article 38.37 did not lower the *quantum* of evidence necessary to support a conviction, but simply provided that a specific type of evidence would be admissible on certain relevant matters. The court went on to state the following:

> Though it is correct to say that the admissibility of evidence under article 38.37 runs in the State's favor, the retrospective application of the statute cannot be said to violate the *ex post facto* clause on this basis alone. The statute does not lower the quantum of proof required for conviction. Before article 38.37, the child victim's testimony concerning prior "acts" committed by the defendant against the child was not admissible unless such evidence fell within an exception under Rule 404(b). In removing the restrictions on that testimony, the statute enlarges the scope of the child's admissible testimony, but leaves untouched the amount or degree of proof required

20

for conviction. Article 38.37 pertains to what kind of evidence may be introduced at law; unlike article 38.07, the statute at issue in *Carmell*, article 38.37 is not a sufficiency of the evidence rule. Here, the question is the admissibility of the evidence, not whether the properly admitted evidence is sufficient to convict McCulloch. *See Carmell*, 529 U.S. at 546 [, 120 S.Ct. 1620]. While the evidence is probative, the evidence is not required for conviction of the offense.

In short, article 38.37 eliminates the necessity of showing the evidence falls within one of the Rule 404(b) exceptions. In that sense, it relaxes the strictness associated with Rule 404(b), but, in no way does it alter the quantum of proof required by law to support the conviction. As the court noted in *Thompson v. Missouri*, 171 U.S. 380 388, 18 S.Ct. 922, 43 L.Ed. 204 (1898), we "cannot adjudge that the accused had any vested right in the rule of evidence which obtained prior to the passage of the [statute], nor that the rule established by that statute entrenched upon any of the essential rights belonging to one put on trial for a public offence."

*Id*. at 684-85 (footnotes omitted).

In *U.S. v. Johnson*, 354 F.Supp.2d 939 (N.D. Iowa 2005), the defendant was charged in connection with the murder of a witness to alleged drug-trafficking activity by her sometime boyfriend. The government filed a pre-trial motion seeking the admission of out-of-court statements by several decedents. The defendant argued that the *ex post facto* clause barred the admission of statements made by Terry DeGues pursuant to Rule 804(b)(6) of the Federal Rules of Evidence, because the "forfeiture by wrongdoing" exception to Rule 804(b)(6) was added by an amendment in 1997, four years after the murders. The court held that Rule 804(b)(6) simply changed what evidence was competent in a criminal prosecution and its application to the defendant's case was not an *ex post facto* violation.

In *People v. Dolph-Hostetter*, 664 N.W.2d 254 (Mich.App. 2003), *appeal denied*, 674 N.W.2d 380 (Mich. 2004), the defendant, her husband Ronald Hostetter, and Dale Smith were arrested for the murder of a woman occurring in

1996. In 2000, Hostetter pled guilty in exchange for agreeing to testify against the defendant at trial. The defendant filed a motion to exclude her husband's testimony on the grounds that its admission would violate the *ex post facto* clause. Prior to its amendment, M.C.L. § 600.2162 specified that a married person or a person that had been married previously could not be examined regarding any communications made between that person and his/her spouse or former spouse during the marriage. In 2001, the statute was amended to allow for testimony regarding prior communications between spouses or former spouses with the consent of the person being examined. The court noted that the amendment at issue was not analogous to the amendment at issue in *Carmell*, 529 U.S. 513. The court held that the amendment to the marital-communications privilege did not alter the quantum of evidence necessary to convict a person, but simply affected what evidence may be introduced at trial and did not violate the *ex post facto* clause.

The retroactive application of Article 412.2 to the Defendant's case did not constitute an *ex post facto* violation. Article 412.2 did not alter the amount of proof required in the Defendant's case as it merely pertains to the *type of evidence* which may be introduced. Prior to the enactment of Article 412.2, the testimony at issue was admissible if it fell within an exception under La.Code Evid. art. 404(B). Article 412.2 merely removed that restriction.

**La.Code Evid. arts. 404(B) and 412.2 Issues**

The Defendant contends the trial court erred in failing to exclude evidence of his other crimes or past bad acts pursuant to La.Code Evid. art. 404(B). He further contends the trial court erred in failing to exclude evidence of his other crimes or past bad acts pursuant to La.Code Evid. art. 412.2. Finally, the Defendant contends the trial court erred in permitting the State to exceed the scope of its notice

given pursuant to Articles 404(B) and 412.2. Inasmuch as these three assignments relate to the same evidence, we will address them together.

The Defendant specifically argues that the State's notice under Article 404(B) was inadequate in that it failed to specifically advise the Defendant of the name of the alleged perpetrator, the name of the alleged victim, the date upon which the alleged acts occurred, and the specific location where the alleged acts occurred. Further, the notice did not inform the Defendant of the applicable section of Article 404(B). For the same reasons, the Defendant alleges the State's notice was inadequate under Article 412.2.

The Defendant also contends he was unable to determine whether the evidence was relevant, fit within an exception to Article 404(B), or whether the probative value of the evidence outweighed its prejudicial effect pursuant to La.Code Evid. art. 403 because the trial court failed to conduct a *Prieur* hearing. Additionally, because there was no *Prieur* hearing, the State failed to satisfy its burden of proving the alleged prior acts were admissible under Article 404(B). The Defendant also avers that a *Prieur* hearing should have been held under Article 412.2 as he was "ambushed by non-charged and acquitted conduct which dated back as far as 33 years prior to trial."

The Defendant further asserts that evidence of other crimes and bad acts was not admissible under both Articles 404(B) and 412.2 pursuant to *State v. Kennedy*, 00-1554 (La. 4/3/01), 803 So.2d 916, *superceded by statute as stated in State v. Zornes*, 34,070 (La.App. 2 Cir. 4/3/02), 814 So.2d 113, *writ denied*, 02-1280 (La. 11/27/02), 831 So.2d 269. The Defendant also asserts the admission of the evidence was unfairly prejudicial. Additionally, the Defendant contends the State's evidence went well beyond the scope of the notice it filed and the trial court abused

its discretion in permitting the admission of the evidence and refraining from admonishing the jury to disregard the evidence.

The State contends that it did not introduce any evidence pursuant to Article 404(B) and that all evidence of prior offenses was introduced under Article 412.2. The State additionally contends that it provided adequate notice to the Defendant of the prior sexual offenses from LaSalle Parish.

The Defendant filed a Motion to Exclude Evidence of "Other Crimes" or "Past Bad Acts" on September 28, 2001, in anticipation of the State's desire to use evidence of other crimes or bad acts. The court held a hearing on October 16, 2001, where the matter was taken under advisement. The State filed its Notice of Intent to Defendant on November 2, 2001, stating its intention to introduce at trial evidence of prior convictions and numerous other prior sexual offenses. The trial court denied the Defendant's motion to exclude on December 4, 2001; however, the State was ordered to describe the acts and offenses it intended to use with more particularity. The Defendant sought review of this decision in a writ filed on December 21, 2001. On March 18, 2002, in *State v. Willis*, an unpublished writ opinion bearing docket number 01-1662 (La.App. 3 Cir. 3/18/02), *writ denied*, 02-1132 (La. 6/14/02), 818 So.2d 780, this court held:

> **WRIT DENIED:** The hearing at issue before this court was held on the Defendant's motion to exclude evidence which he anticipated the State to introduce. Thus, Defendant bore the burden of proof at this hearing and he failed to meet this burden. Therefore, we find no error in the trial court's ruling denying the Defendant's motion. However, this ruling should not be interpreted as permitting the introduction of the alleged other crimes or bad acts evidence without conducting the required *Prieur* hearing. *See State v. Prieur*, 277 So.2d 126 (La.1973).... Accordingly, the Defendant's writ application is denied.

On March 26, 2003, the Defendant filed a Motion for *Prieur* Hearing. At a hearing on April 22, 2003, the trial court ruled that the State had provided the

24

necessary evidence.  The Defendant sought review of this decision in a writ filed on May 23, 2003.  On June 12, 2003, in *State v. Willis*, an unpublished writ opinion bearing docket number 03-648 (La.App. 3 Cir. 6/12/03), this court held:

> **WRIT DENIED:**  In *State v. Willis*, an unpublished writ opinion bearing docket number 01-1662 (La.App. 3 Cir. 3/18/02), this court ordered a *Prieur* hearing be held to determine the admissibility of the Defendant's other crimes evidence pursuant to La.Code Evid. art. 412.2.  However, before the trial court held the hearing, the Louisiana Supreme Court ruled that a pretrial determination of the admissibility of article 412.2 evidence is not required, and the procedural requirements of *Prieur* are inapplicable. *See State v. Williams*, 2002-1030 (La. 10/15/02); 830 So.2d 984.
>
> At the hearing, the trial court stated that the other crimes evidence is admissible "at this time"; leaving open the final determination of the admissibility of the evidence at trial.  Therefore, the trial court's ruling is not a final definitive ruling.  Additionally, the hearing previously ordered by this court was no longer necessary and the issue concerning the admissibility of the evidence at issue may be raised during the trial of this matter.
>
> Furthermore, at the hearing held in this matter, the trial court found that because La.Code Evid. art. 412.2 is procedural, and not substantive, it can be applied retroactively without violating *ex post facto* prohibitions. We note this distinction is no longer valid. *See Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715 (1990) and *Carmel*[*l*] *v. Texas,* 120 S.Ct. 1620, 529 U.S. 513 (2000). However, as this case is not in a procedurally proper posture, this court does not reach the issue of whether La.Code Evid. art. 412.2 violates *ex post facto* prohibitions.
>
> Accordingly, we do not reach the merits of the claims raised by Defendant and we deny his application.

The Defendant filed a Motion and Incorporated Memorandum for *Prieur* Hearing on June 4, 2004.  The Defendant's motion was denied on July 8, 2004.  On June 18, 2004, the State filed a letter wherein it listed five witnesses and informed defense counsel that the necessary details of the past crimes could be obtained by interviewing the listed witnesses and by reviewing files from LaSalle Parish.

25

Additionally, a comparison of the crimes committed in LaSalle Parish and Catahoula Parish was filed in the record in June 2004.

## ARTICLE 412.2

Pursuant to La.Code Evid. art. 412.2, "evidence of the accused's commission of another sexual offense may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403." The clear wording of the statute covers evidence of other sexual offenses and anything that forms an integral part of that act. Integral act evidence is evidence that is "'related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it.'" *State v. Colombo*, 98-2813, p. 3 (La. 10/1/99), 747 So.2d 1074, 1075 (quoting *State v. Brewington*, 601 So.2d 656, 657 (La.1992)).

The Defense limits the issue regarding prior offenses to evidence involving the Defendant's prior victims. The evidence presented by the State in its case included testimony involving physical abuse to Ms. Lockwood, Ms. Chisom, their mother, and their brothers and sisters. There was testimony that the Defendant had sex with all children in the family and, if the girls refused to have sex with him, he beat the entire family. There was additional testimony that the Defendant beat and hung the mother from a tree and that he set fire to their home. Evidence regarding beatings received in relation to a sexual act or the refusal to commit such an act would be admissible under Article 412.2 as an integral part of the offense. Evidence regarding maltreatment not related to a sexual offense and evidence that the Defendant set the house on fire would be admissible if the requirements of Article 404(B) were met. Accordingly, the State's assertion that it did not present any evidence pursuant to Article 404(B) is incorrect.

The supreme court in *Williams*, 830 So.2d 984, held that Article 412.2 does not require the trial court to hold a pre-trial hearing before admitting the evidence. "Whether or not we would be inclined to disagree with that holding is irrelevant, because the appellate court is bound to follow Louisiana Supreme court opinions. *Pelican State Association v. Winder*, 253 La. 697, 219 So.2d 500 (La.1969)." *State v. Serio*, 94-131, p. 4 (La. 5 Cir. 7/01/94), 641 So.2d 604, 607, *writ denied*, 94-2025 (La. 12/16/94), 648 So.2d 388. Accordingly, this court cannot say the trial court erred in failing to hold a pre-trial hearing regarding the admissibility of evidence pursuant to Article 412.2.

In *Kennedy*, 803 So.2d 916, the supreme court held that absent a dispute as to whether the accused intended to commit the crime, evidence of other crimes was prohibited to show intent when the crime charged was a general intent crime. The Defendant argues that *Kennedy* is applicable in the case at bar. However, the decision in *Kennedy* was implicitly overruled by the legislature's enactment of Article 412.2. Even so, the trial court in this case was required to determine whether the probative value of the evidence of prior sex offenses was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403; La.Code Evid. art. 412.2.

In *State v. Olivieri*, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, the fifth circuit compared Article 412.2 to Federal Rule of Evidence 413 inasmuch as the supreme court has noted that the two are similar. The court made the following remarks:

> Although the wording of the federal rule differs from the Louisiana rule, as observed by the Louisiana Supreme Court in *Williams*, [830 So.2d 984,] a review of federal jurisprudence reveals the two rules are virtually identical in application. In particular, the federal courts have held

that evidence introduced under Federal Rule of Evidence 413 is subject to the Federal Rule of Evidence 403 balancing test. *United States v. Mound,* 149 F.3d 799, 800 (8th Cir.1998), *cert. denied,* 525 U.S. 1089, 119 S.Ct. 842, 142 L.Ed.2d 697 (1999); *United States v. Guardia,* 135 F.3d 1326, 1330 (10th Cir. 1998). . . .

. . . .

. . . The federal courts have noted that "Rule 413 is based on the premise that evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes, and often justifies the risk of unfair prejudice." *United States v. Enjady,* [ 134 F.3d 1427, 1430-1431 (10th Cir. 1998), *cert. denied,* 525 U.S. 887, 119 S.Ct. 202, 142 L.Ed.2d 165 (1998)]. The courts have concluded that "Rule 413 supersedes Rule 404(b)'s restriction and allows the government to offer evidence of a defendant's prior conduct for the purpose of demonstrating a defendant's propensity to commit the charged offense." *United States v. Guardia, supra* at 1329. Furthermore, the courts have noted there is no inherent error in admitting evidence under Rule 413 that would be inadmissible under Rule 404(b). *United States v. Mound, supra* at 802.

In discussing the effect Federal Rule 403 has on Rule 413, the federal courts have stated that propensity evidence is relevant. *United States v. Guardia, supra* at 1328. The courts caution that, in applying the 403 balancing test, careful attention must be given to "both the significant probative value and the strong prejudicial qualities inherent in all evidence submitted under 413." *Id.* at 1330. The United States Tenth Circuit observed that "[i]f Rule 413 evidence were always too prejudicial under 403, Rule 413 would never lead to the introduction of evidence." *Id.* The federal courts have recognized "the strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible" and have read Rule 413 to create somewhat of a presumption that the evidence is admissible. *United States v. LeCompte,* 131 F.3d 767, 769 (8th Cir.1997); *United States v. Enjady, supra* at 1431.

In *United States v. Enjady, supra,* defendant was convicted of aggravated sexual abuse. During trial, the State introduced evidence under Federal Rule 413 of a prior rape defendant allegedly committed through the testimony of the alleged victim. The defendant appealed claiming prejudicial error in the admission of the evidence of the prior rape. The United States Tenth Circuit found the trial court properly ruled the evidence admissible under

Rule 413 and properly considered Rule 403 in balancing the probative value of the evidence against prejudice to the defendant. The court noted "the exclusion of relevant evidence under Rule 403 should be used infrequently, reflecting Congress' legislative judgment that the evidence 'normally' should be admitted." *United States v. Enjady,* 134 F.3d at 1432.

In discussing "unfair prejudice" as contemplated by Rule 403, the United States Eighth Circuit stated, "Rule 403 is concerned only with 'unfair prejudice, that is, an undue tendency to suggest decision on an improper basis.'" *United States v. Gabe*, 237 F.3d 954, 959 (8th Cir. 2001), *quoting United States v. Yellow,* 18 F.3d 1438, 1442 (8th Cir. 1994). The court noted that evidence under Federal Rule 414 is prejudicial for the same reason it is probative, it shows the defendant's propensity to molest young children. The court concluded that "because propensity evidence is admissible under Rule 414, this is not *unfair* prejudice." *Id.* at 960.

*Id*. at 217-18 (footnote omitted).[4]

The court went on to hold that evidence of the prior rape by the defendant was "highly relevant to show defendant's propensity to sexually assault women as they tend to matters near their vehicles and to attempt to kidnap the women and drive away in their vehicles." *Id*. at 218-19. The court noted that for the same reasons the evidence was probative, it was also prejudicial to the defendant. The court then made the following comments:

Like Congress, the Louisiana Legislature saw a need to lower the obstacles to admitting propensity evidence in sexual assault cases. Considering the purpose behind Article 412.2, the evidence is not so prejudicial as to warrant exclusion. There is no indication evidence of the prior rape confused or misled the jury. The evidence was presented in an orderly manner with evidence of the prior rape being presented at the end of the trial, clearly and succinctly through two witnesses. Thus, there was little chance the jury could confuse the facts of the two crimes. Additionally, the fact that approximately twelve years

---

[4]Federal Rule of Evidence 414(a) provides as follows: "In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant."

> passed between the prior rape and the current rape, does not mandate the exclusion of the evidence. The Legislature, like Congress, did not see fit to impose any time limit on the admission of prior sex offenses. *See, United States v. Gabe, supra* at 960.

*Id*. at 219.

In *State v. Brown*, 03-1747 (La.App. 3 Cir. 5/12/04), 874 So.2d 318, *writ denied*, 04-1413 (La. 11/8/04), 885 So.2d 1118, this court noted that the determination of the admissibility of the defendant's prior conviction was a very close call and turned upon the extent and quality of the trial court's limiting instruction to the jury. The defendant twice requested a limiting instruction regarding other crimes evidence. This court held that the trial court's failure to give the instruction was not harmless error. This court stated that the only evidence of the crime was the "somewhat inconsistent testimony of an eleven-year-old girl" and without a qualifying instruction, it could not be "ruled out that the jury found the defendant guilty because they decided he was a bad man who had committed a forcible rape in the past." *Id*. at 331-32. The court noted that unlike *Olivieri*, 860 So.2d 207, the record indicated "the jury was confused and the evidence may have been presented in such a manner so as to cause confusion when the facts of the 1987 conviction were read to the jury just prior to the victim's testimony." *Id*. at 328. During deliberations, the jury sent two notes to the trial court. In the first, the jury asked for the victim's testimony. The second note questioned the number of votes necessary to reach a verdict. The trial court informed the jury that testimony could not be repeated and sent them back to continue deliberations. The jury voted ten to two to convict. *Brown*, 874 So.2d 318.

The evidence of prior sex crimes in this case was admissible under Article 412.2, and C.M. is the type of victim the legislature sought to protect when it enacted the article. The evidence was permissible to prove propensity and was not

unfairly prejudicial, as the trial court gave an instruction to the jury at the close of trial indicating that

> [s]uch evidence is not admissible to prove that Mr. Willis is a 'bad person' or that, in committing the charged offenses, he acted in conformity with prior crimes or prior bad acts. However, this evidence may be admissible for such purposes as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Additionally, the fact that the prior sex offenses occurred many years before trial is not significant as the legislature did not set forth a time limitation in Article 412.2.

## ARTICLE 404(B)

The evidence of beatings not involving a sexual offense and the setting of the house on fire are not covered by Article 412.2. For that evidence to be admissible, it would have to fall within one of the exceptions set out in Article 404(B), which provides, in pertinent part, as follows:

> B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Before other crimes evidence can be admitted under Article 404, the requirements of *Prieur*, 277 So.2d 126, must be met. Pursuant to *Prieur*,

> the state must, within a reasonable time before trial, provide written notice of its intent to use other acts or crimes evidence and describe these acts in sufficient detail. The state must show the evidence is neither repetitive nor cumulative, and is not being introduced to show the defendant is of bad character. Further, the court must, at

the request of the defendant, offer a limiting instruction to the jury at the time the evidence is introduced. The court must also charge the jury at the close of the trial that the other crimes evidence serves a limited purpose and that the defendant cannot be convicted for any crime other than the one charged or any offense responsive to it.

*State v. McArthur*, 97-2918 (La. 10/20/98), 719 So.2d 1037, *superceded by statute*

*as stated in State v. Brown*, 874 So.2d 318, *writ denied*, 885 So.2d 1118. Even if the

above requirements are not met,

> [N]ot every *Prieur* violation mandates reversal. *State v. Pardon*, 97-248 (La.App. 5 Cir. 10/15/97), 703 So.2d 50, 57, *writ denied*, 97-2892 (La.3/20/98), 715 So.2d 1207. Before a defendant can complain of a *Prieur* violation, he must first show prejudice. *Id*. In *State v. Lee*, 25,917 (La.App. 2 Cir. 5/4/94), 637 So.2d 656, 662, *writ denied*, 94-1451 (La.10/7/94), 644 So.2d 631, the Second Circuit explained that "the rules of *Prieur* were not meant to be used as additional, technical procedures sacramental to a valid conviction" and noted that substantial compliance with *Prieur* is all that is required.

*State v. Temple*, 01-655, p. 20 (La.App. 5 Cir. 12/12/01), 806 So.2d 697, 709-10, *writ*

*denied*, 02-0234 (La. 1/31/03), 836 So.2d 58.

> In any event,

> [t]he erroneous admission of other crimes evidence is subject to harmless error analysis under the standard set out in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See State v. Gibson*, 391 So.2d 421 (La.1980). Under *Chapman*, an appellate court must decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," and "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824.

> The Chapman standard was later refined in *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), as follows:

> > "Consistent with the jury-trial guarantee, the question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but

> rather what effect it had upon the guilty verdict in the case at hand . . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (emphasis in original).

*State v. Bell*, 99-3278, pp. 5-6 (La. 12/8/00), 776 So.2d 418, 421-22.

Regardless of whether a *Prieur* hearing was held, the Defendant was not prejudiced. Evidence of the Defendant's commission of prior sexual offenses was before the jury pursuant to Article 412.2. Accordingly, the introduction of evidence relating to beatings not involving a sexual offense and the setting of the house on fire was surely unattributable to the verdict.

In summary, the evidence of prior sexual offenses and beatings that formed an integral part of those offenses was admissible under Article 412.2. The remainder of the other crimes evidence, if improperly admitted, was harmless error.

## NOTICE

The Defendant avers that the State's Article 412 notice was inadequate. Additionally, because the Sate failed to provide reasonable notice, defense counsels allege they did not have the ability to cross-examine Judy Chisom or Charlotte Lockwood.

The State's notice read, in pertinent part, as follows:

> In accordance with the provisions of Article 412 of the Louisiana Code of Evidence, you are hereby notified of the State's intention to introduce into evidence of convictions in LaSalle Parish:
>
> 1. Indecent Behavior with a Juvenile.
>
> 2. Three (3) counts of Carnal Knowledge of a Juvenile on Charlotte, Judy and Cheryl Bates.

Also the State intends to introduce evidence of other offenses in LaSalle Parish including:

1.    Forcible Rape of Judy Bates on April 29, 1981.

2.    Various other acts or offenses against Jimmy, Charlotte, Judy and Cheryl Bates in that during the years of 1973, 1974, 1975, 1976, 1977, 1978, 1979, 1980 and 1981 he did engage in a reoccurring course of conduct, wherein he did wilfully and unlawfully violate the laws of Simple Assault, Aggravated Assault, Simple Battery, Aggravated Battery, Aggravated Rape, Forcible Rape, Sexual Battery, Aggravated Oral Sexual Battery, False Imprisonment, Carnal Knowledge of a Juvenile, Molestation of a Juvenile, Cruelty of Animals, and Simple Criminal Damage to Property.

At a hearing held on April 22, 2003, the State informed defense counsel that it intended to prove the offenses as follows:

I intend to offer and introduce his guilty pleas to the Bill number 24269, Indecent Behavior With a Juvenile; 24904, Carnal Knowledge of a Juvenile; 24905, Carnal Knowledge of a Juvenile; 24906, Carnal Knowledge of a Juvenile; plus the State intends to offer evidence in form of, the victims of each of these offenses, sworn testimony. And witnesses to those occurrences by other victims.

The State additionally informed the court and defense counsels that it intended to introduce the birth certificate wherein the Defendant was listed as the father of a baby born to a juvenile. Admitted into evidence at the hearing held on April 22, 2003 was State exhibit 2. Included therein was a time-line which indicated acts of molestation by the Defendant upon Charlotte, Judy, and Cheryl. Additionally, the exhibit indicated that Charlotte Lockwood was forced to sleep in bed with the Defendant, the Defendant had sexual intercourse with the writer of the list,[5] the

_____

[5]We assume that Judy Chisom wrote the list.

34

mother was hung from a tree, and the entire family was beaten. Ms. Lockwood became pregnant, had the Defendant's child, and eventually ran away. When she ran away the Defendant set the house on fire and Judy Chisom took Ms. Lockwood's place. Ms. Lockwood agreed to come back for the sake of her sister and eventually married the Defendant. Additionally, on June 18, 2004, the State sent a letter to defense counsel informing them that the details of the crimes could be obtained by interviewing J.W., Charlotte Lockwood, Judy Chisom, R.M., and Jimmy Bates, and that further information could be obtained by examining the record of the proceedings in LaSalle Parish.

We cannot say the Defendant was prejudiced by the notice. The notice contained the names of the Defendant's prior victims, the years in which the alleged acts occurred, and indicated the offenses occurred in LaSalle Parish. The Defendant was also provided with information regarding the testimony of Ms. Lockwood and Ms. Chisom, as evidenced by State exhibit 2 introduced on April 22, 2003. Additionally, the defense could have reviewed the file from LaSalle Parish and interviewed various witnesses.

The Defendant is correct in his assertion that the notice did not contain the section of Article 404(B) relied upon by the State. However, Article 404(B) does not require that information to be set forth in the notice. Additionally, all evidence of prior sexual offenses was admissible under Article 412.2, and there is no requirement in that article wherein the State must lay out the basis for the admissibility of such evidence.

The Defendant set forth examples of the testimony he felt went beyond the scope of the State's notice. He cites the testimony of Ms. Lockwood wherein she stated that the Defendant frequently physically beat her and her family. She additionally testified that the Defendant molested "all my brothers and sisters." The

35

Defendant avers that the notice contains no information regarding homosexual activity.

The Defendant contends he objected to the testimony regarding the Defendant's involvement with males. We find no such objection. Ms. Lockwood was asked whether she had any personal knowledge of "any of this type of activity" between the Defendant and her brothers and sisters. Ms. Lockwood testified that the Defendant molested "all my brothers and sisters." She then indicated she meant the Defendant "had sexual intercourse, oral sex, made them have oral sex on him." She indicated this happened to Jimmy, Judy, Cheryl, and herself. Four other questions were asked then the State asked Ms. Lockwood to tell the jury how the Defendant beat her. Defense counsel then objected, stating the following: "I would like to impose an objection. That goes outside the scope of 412 and 404B and for reasons previously stated, we have not had appropriate notice. We have not had appropriate pretrial prieur hearings and for these reasons I want to state the objection for the record." The objection referred to beatings received by Ms. Lockwood, and the Defendant failed to object to the testimony regarding males. Accordingly, the Defendant failed to preserve this issue for review. La.Code Crim.P. art. 841.

These assignments lack merit.

**Mistrial Request**

The Defendant contends the trial court erred in failing to declare a mistrial because, he says, the State misled the jury regarding the law under Articles 404(B) and 412.2 during its opening statement.

During opening statements, the State made the following comments:

> Defense counsel in its voir dire indicated there may be
> something in his past that the State may bring out that you
> might should exclude. I'm not going to go into that now,
> but I am going to tell you I am going to introduce evidence

36

of what he has done in his past in an attempt to prove what occurred in this case. The law allows that under two or three different codal articles. The State does intend to introduce evidence of that effect. I wish I had ten people that had just gotten out of church that could say yes, I saw this. I haven't because this happened under the privacy of the bedroom. But I've got two that's going to tell you, and I don't think the two people's tales are going to be word for word identical.

This assignment is without merit. The Defendant failed to move for a mistrial or make an objection at the time these comments were made. Accordingly, he waived his right to have this issue addressed on appeal. *See State v. Davis*, 02-2059 (La.App. 4 Cir. 1/22/03), 839 So.2d 176; *State v. Clark*, 02-1463 (La. 6/27/03), 851 So.2d 1055, *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1433 (2004).

## Challenge for Cause

The Defendant asserts that the trial court erred in failing to grant a challenge for cause to the defense for juror Ashley Book. Louisiana Code of Criminal Procedure Article 797 states, in pertinent part:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> . . . .
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
>
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict.

The Defendant asserts that the trial court erred in denying his challenge for cause because Ms. Book had contact with the prosecutor before this case began

as well as on the first night of the instant trial. Further, the Defendant alleged that the juror had domestic issues that would cause her to be unacceptably sympathetic to the State's witnesses.

The issues with the juror first came to light during trial, on the morning of Wednesday, July 21, when the district attorney disclosed that Ms. Book had called his cell phone on the previous night. Ms. Book made the call in order to inform him that she would be late in arriving for the following day's trial. When he realized she was a juror in an ongoing trial, the State's attorney immediately informed Ms. Book that he could not speak with her and ended the conversation.

Ms. Book had previously contacted the district attorney's private law office in order to determine whether he could represent her in a domestic matter. This conversation was limited to a discussion of the costs and the need for an office appointment, but the record does not show that Ms. Book made any further arrangements to retain his legal services.

Louisiana Code of Criminal Procedure Article 796 states:

> If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course.

In the application of Article 796, the jurisprudence indicates that whether a juror should be dismissed is a matter subject to the discretion of the trial court. In *State v. Fuller*, 454 So.2d 119 (La.1984), a juror was dismissed during a capital trial for violating the judge's sequestration order. The decision to replace that juror with an alternate juror was made following an evidentiary hearing at which all parties were present, and held in order to determine the existence, nature and extent of the juror's violation and the proper action to take. In affirming the trial court's decision, the supreme court recognized that "[t]he judge . . . considered alternative courses of

action" and ruled that "[r]eplacing the juror with the alternate under the overall circumstances was a proper exercise of the trial judge's discretion." *Id.* at 123.

The trial judge did not abuse his discretion in denying the Defendant's challenge of juror Ashley Book for cause. The trial judge determined that the minimal contacts between the juror and the district attorney, occurring prior to the trial, and on the night following the first day of trial, were not sufficient to call into question the impartiality of that juror. This conclusion was not an abuse of discretion. Accordingly, this assignment is denied.

**Prosecutorial Misconduct**

The Defendant contends the trial court erred in failing to declare a mistrial for prosecutorial misconduct during closing argument and rebuttal. Additionally, the Defendant contends the trial court failed to admonish the jury to disregard the improper comments.

> The scope of proper closing argument is confined to "evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom and to the law applicable to the case." La.Code Crim. Proc. Ann. art. 774 (West 1998). However, a prosecutor is afforded considerable latitude in making closing arguments. *State v. Byrne*, 483 So.2d 564 (La.1986), *cert. denied*, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); *State v. Morris*, 404 So.2d 1186 (La.1981). As a general rule, the prosecutor may not use closing argument as a vehicle to express his personal opinions about the defendant when his opinion is expressed in a manner that the jury may understand has been formed from evidence outside of the record. *State v. Procell*, 365 So.2d 484, 489 (La.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979). Such an opinion is permissible if the prosecutor refers to, or it is apparent that his opinion is based on, the evidence of record. *Id. See also State v. Hicks*, 395 So.2d 790, 797-98 (La.1981); *State v. Bretz*, 394 So.2d 245, 248 (La.1981), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).
>
> This Court has recognized as a matter of well-settled law that the prosecutor has the right to "press upon the jury

> any view of the case arising out of the evidence--the Supreme Court is bound to credit jurors with common intelligence, conscientiousness, and sense of duty." *State v. Alexander*, 215 La. 245, 40 So.2d 232, 234 (La.1949). Even when we have found the prosecutor to have exceeded the proper bounds of argument, this Court has often criticized the improper arguments without finding that they constituted reversible error. *See*, *e.g. Byrne, supra*; *State v. Jarman*, 445 So.2d 1184 (La.1984); *State v. Messer*, 408 So.2d 1354 (La.1982). The standard by which this Court determines whether improper closing argument constitutes reversible error is whether it is "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." *State v. Sanders*, 93-0001 p. 16-17 (La.11/30/94), 648 So.2d 1272, 1285-86, *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); *Byrne*, 483 So.2d at 572; *Messer,* 408 So.2d at 1357.

*State v. Frost*, 97-1771, p. 18-19 (La. 12/1/98), 727 So.2d 417, 432-33, *cert. denied*, 528 U.S. 831, 120 S.Ct. 87 (1999), *superceded by statute on other grounds as stated in State v. Gomez*, 00-0566 (La. 1/17/01), 778 So.2d 549.

During closing arguments, the State made the following comments:

> She pled guilty to the appropriate crime and Judge Boothe is going to sentence her. That's it. We're not forcing [J.W.] to come in here and testify. She did that of her own free will. She is going to pay the price and the Judge is going to sentence her. So what's the offensive, ladies and gentlemen? I mean there is not doubt in my mind that this man committed this crime.

Defense counsel objected to the comments. However, the court denied the objection.

On appeal, the Defendant contends that in making these comments the prosecutor expressed his personal opinion as to the Defendant's guilt and put his "stamp of approval" on J.W.'s credibility.

The State continued its closing argument, making the following statements:

> If you find this person not guilty you've got to call all those ladies right there liars. You think they're lying? That's what you've got to do. When you come back in here and say not guilty, you're calling them a liar. That's what you

40

have to do. And I submit to you, ladies and gentlemen, there is no way those ladies would submit themselves to this type of cross examination, this type of public humiliation. You talk about something that personal, that devastating, what this man did to her. He victimized them over and over and over and over and over again for years.

During rebuttal, the State made the following remarks:

Of course, in my job I represent the state. I represent the people of Catahoula Parish. I don't represent criminal defendants. I did at one time. Didn't like it so I went the other way. And I can tell you this, I'd have to be awful, awful sure of somebody's innocence before I would ever defend anyone myself.

Defense counsel moved for a mistrial after these comments, indicating the Defendant had a constitutional right to representation and the prosecutor was using the authority and credibility of the District Attorney's Office to try to win his case. The motion was denied. The Defendant contends that with these remarks, the prosecutor inappropriately used the authority and credibility of the District Attorney's Office to sway the jury. Additionally, the prosecutor impugned the presumption of innocence as well as the Defendant's right to counsel.

The State continued its rebuttal, making the following comments:

Beyond a reasonable doubt, that's all we have to prove. And you did see me stand up before you and dismiss an indictment. The reason the state did that is because there was not, in my opinion there was not reasonable cause after hearing all of that testimony to do. I would not call upon you as a juror to consider a charge of this magnitude if I wasn't fully convinced of it and if I couldn't prove it beyond a reasonable doubt.

Defense counsel again sought to stop the prosecutor from giving what he felt was the prosecutor's opinion. The court instructed the prosecutor to refrain from giving his "personal feelings and private thoughts." On appeal, the Defendant argues that with these comments, the prosecutor "injected his personal opinion while armed with the cloak of authority of the district attorney's office."

41

The State continued, making the following remarks:

> Well, there's one thing else and I took offense to this, Mr. Davis' spoken statement. He said that [J.W.] would do or say anything to get out of jail. I don't know if you resent that or not but as a person, I do. Because it means that I would have to promote this, condone this. And there's even a line in the –

Defense counsel then objected. The trial court cautioned the State, making the following statements: "But there was a strong implication in the defendant's closing argument of this type of situation. I want to caution Mr. Johnson to avoid using personal credibility or the credibility of the office. Just - - stay away from that. All right." The Defendant contends the prosecutor advised the jury that he believed in the credibility of a witness and placed his authority behind the credibility of that witness.

The Defendant cites *State v. Duke*, 358 So.2d 293 (La.1978), in support of his arguments. In *Duke*, the prosecution made the following comments during closing argument:

> "(The defense counsel) tells you that I'm harassing him (the accused) because I'm prosecuting him. Well, let me tell you, Gentlemen, like I said before. I'm doing my job, and my job is to convict people that I feel are guilty. And that's exactly what I'm doing. I've nol-prossed many, many cases. I've dismissed cases, Gentlemen."

*Id*. at 294. The court held these remarks were improper and stated the following:

> [O]ur jurisprudence has regarded this type of error as prejudicial, if the prosecutor's argument clearly indicates that it is an expression of his personal belief of the accused's guilt not expressly or impliedly based on the evidence in the record, or if (in derogation of the constitutional presumption of innocence) the argument invokes the influence of the prosecutor's official position by a clear implication that the defendant would not have been prosecuted unless he were in fact guilty.
>
> In isolated excerpt, the portion of the argument quoted appears to fall within that category of prejudicial prosecutorial argument which requires mistrial.

> . . . .

> Ultimately, we conclude that, under the circumstances and in the context of the entire argument, the admonition instead of a mistrial was sufficient to assure a fair trial. La.C.Cr.P. art. 771. These circumstances include: the isolated context of the comment in the light of the entire argument; the prompt objection to it, promptly sustained with an admonition to the jury to disregard it; That the brief comment only by implication indicated the prosecutor's improper suggestion that he himself believed the accused guilty and only prosecuted guilty persons-an implication which (due to the brevity of the comment and the swiftness of curative admonition by the judge) was unlikely to have been deduced by the jury; and the non-improper intended nature of the comment, which (in the context of the entire argument by both counsel) was only to respond to a defense argument contending there was improper harassment of the accused by the prosecution.

*Id*. at 294-95.

The Defendant also cites *State v. Smith*, 554 So.2d 676 (La.1989), and *State v. Kaufman*, 304 So.2d 300 (La.1974), for the proposition that a "prosecutor cannot vouch for the credibility of a witness or use the credibility and prestige of the district attorney's office to bolster its case."

The Defendant points out the following language from *Smith*, 554 So.2d 676:

> [I]t has consistently been held to be reversible error for the prosecutor to express his belief in the guilt of the accused, or the credibility of a key witness, *where doing so implies that he has additional knowledge or information about the case which has not been disclosed to the jury*.

*Id*. at 681 (emphasis added).

In *Kaufman*, 304 So.2d 300, the prosecutor made the following comments:

> 'I don't believe that Willie Holmes, a friend of Kaufman, confessed to robbery and murder, unless it was true' (objection made by defendant), then immediately a reference to Delores Williams as yet a third participant in the killing (objection), then, 'Gentlemen, my argument,

> when I speak in a personal way, my argument is based on the evidence, and believe me, that's right, I personally feel from the evidence that I have a case; *Otherwise, I wouldn't be here, because it's within my power to be here or not be here*' (objection).

*Id*. at 307 (emphasis added). The supreme court noted that the basis for the defendant's objection was that the prosecutor was expressing his personal opinion as to the defendant's guilt. The court concluded the prosecutor's argument went "beyond the permissible bounds" and constituted an attack on the presumption of innocence. *Id*. at 308. Additionally, the prosecutor's comments emphasized his function as an officer of the government and tended to exploit it. The court noted that such an argument was "almost universally held to be objectionable." *Id*. The court went on to hold that the improper and prejudicial argument was an additional reason for reversal. *Id*. The Defendant points out the following language in *Kaufman*, 304 So.2d 300: "'*Adds to the probative force of the testimony adduced upon the trial the weight of the prosecutor's personal influence, knowledge, professional opinion, or the influence of his official position*.' (italics ours.)" *Id*. at 308, *quoting* 5 Wharton's Criminal Law and Procedure (Anderson ed., 1967).

Additionally, the Defendant cites *State v. Jones*, 98-1165 (La.App. 3 Cir. 2/3/99), 734 So.2d 670. In *Jones*, the prosecution made the following comments:

> How is it that he's a self-confessed liar when what he is saying totally coincides with what Mr. LeJeune said took place that day? The problem is that this self-confessed liar took responsibility for what he did and pled guilty. Mr. Jones does not want to take responsibility for his actions.

*Id*. at 671-72. This court held that the comments by the prosecutor were improper and violated the defendant's constitutional right to the presumption of innocence. However, the court found that a constitutional error did not automatically require reversal and that a reversal was warranted only when the substantial rights of the accused are affected. The court went on to find that the comments had a "high

probability of allowing the jury to impose a lesser standard than guilt beyond a reasonable doubt." *Id*. at 673. Furthermore, the comments were "unrelated to any truth-seeking function and aborted the presumption of innocence and right to a fair trial" guaranteed by the constitution. *Id*. This court ordered a mistrial and remanded the matter for a new trial.

In *State v. Plaisance*, 32,489 (La.App. 3 Cir. 10/27/99), 745 So.2d 784, *writ denied*, 99-3609 (La. 6/2/00), 763 So.2d 594, the prosecutor made the following comments: "It only gets here if the case is presented to grand jury and the person is indicted for murder and brought to trial." *Id*. at 790. The state argued that the comment was in response to the defendant's closing argument which included the following statement: "It doesn't take much to accuse someone of a crime. Any time someone dies, somebody is going to be accused of killing them. Somebody is going to be accused of murder." *Id*. The defendant relied on the statement made by the prosecution in *Kaufman*, 304 So.2d 300. The court concluded that the state's comments were not "nearly as clear and direct an expression of personal opinion as those in *Kaufman*." *Id*. As the state's comments were made to rebut those of the defendant, the court noted that the remarks could be interpreted as an explanation of the criminal process as much as an expression of the prosecutor's personal belief in the defendant's guilt. However, the court held that the state's comments were an explanation of the prosecutorial process offered to rebut the defendant's argument. The court went on to state that even if the comments amounted to a personal belief in the defendant's guilt, it was an isolated comment.

In *State v. May*, 339 So.2d 764 (La.1976), the prosecutor made the following comments in closing argument: "Now, so far as I'm concerned, after hearing that evidence, he is guilty, and there is no question in my mind about it." *Id*. at 775. The court noted that these comments were preceded by a lengthy recitation

of facts proven at trial. The court held that, taken in context, the statement was not the type that required reversal, as the attorney did not imply that he had personal knowledge of facts not presented to the jury that indicated the defendant's guilt.

In *State v. Cuchinelli*, 261 La. 789, 261 So.2d 217 (La.1972), the prosecutor stated the following: "'I don't know, but I'm firmly convinced that at 10:30 on April 13, 1970, Frances Cuchinelli murdered Judy McManus on that gravel road.'" *Id*. at 221. The court held that after reading the state's entire argument, it was persuaded that the prosecutor did not intend to convey his personal opinion that the defendant was guilty. The court went on to find that, taken in context, the prosecutor meant that based on the evidence he was convinced that the defendant killed the victim at the time and place stated.

In *State v. Theard*, 527 So.2d 393 (La.App. 4 Cir.), *writ denied*, 533 So.2d 372 (La.1988), the prosecutor stated, "It's clear as a bell and that's why the Grand Jury indicted him for second-degree murder because the evidence show it was a second-degree murder." *Id*. at 398. The court noted that "[i]t is impermissible for the prosecutor to abandon his argument on the evidence and express his opinion as to the guilt of the defendant by commenting that he would not prosecute if he did not have a case. C.Cr.P. Art. 774: *State v. Hamilton*, 356 So.2d 1360 (La.1978); see also *State v. Procell*, 365 So.2d 484 (La.1978); *State v. Sawyer*, 350 So.2d 611 (La.1977)." Although the prosecutor's comments were improper, the court did not reverse the defendant's conviction because the improper comments did not materially contribute to the verdict based on the fact that the jury deliberated for only nine minutes, three eyewitnesses testified that the defendant shot the victim in the back without physical provocation as the victim was attempting to flee, and the defendant admitted shooting the victim. *Id*.

The prosecutor in this case stated, "there is no doubt in my mind that this man committed this crime." This comment, when taken alone, appears to be an improper reference to the guilt of the Defendant and would require that a mistrial be ordered. However, when taken in context, this comment does not appear to be improper. This comment was made after a long recitation of the facts, a discussion regarding J.W.'s guilty plea, and the fact that it was up to the judge to sentence J.W., not the District Attorney's Office. This comment is almost identical to the one made by the prosecutor in *May*, 339 So.2d 764. As in *May*, the prosecutor's comments in this case came after a discussion of the testimony at trial and the prosecutor did not imply that he had personal knowledge of facts not presented to the jury which indicated the Defendant's guilt.

The prosecutor further commented that he once represented defendants but could not now defend someone unless he was "awful sure" of their innocence. Prior to these comments, the prosecutor pointed out the fact that defense counsel did not call several witnesses to support theories he used to "put a little seed of doubt" in the mind of the jury. The prosecutor stated that defense counsel used a "pretty good trick" and he would have to remember "that one." He then made the comments at issue. Taken in context, the prosecutor's comments may be viewed as his attempt to inform the jury that his function was different than that of a defense attorney and he was no longer interested in defending anyone. These remarks were not as clear and distinct as those in *Duke*, 358 So.2d 293, *Kaufman*, 304 So.2d 300, *Jones*, 734 So.2d 670, and *May*, 339 So.2d 764. Additionally, the prosecutor's comments did not contain any reference to evidence outside the record.

The prosecutor stated, when discussing a dismissed charge, that he would not ask the jury to consider a charge unless he was fully convinced of it and could prove the charge beyond a reasonable doubt. During the defense's closing

argument, the following remarks were made: "Some evidence was presented to the Grand Jury. I assume it was [C.M.] That's how they got the indictment. Well something different must have happened from this witness stand because now they dropped one of those very serious aggravated rape charges which carries a life in imprisonment penalty." Defense counsel later made the following comments: "I submit that you will receive very clear doubts, reasonable doubts in this case. The same type of doubts that apparently occurred when they dismissed the first count in the middle of the trial." As in *Plaisance*, 745 So.2d 784, the comments by the prosecutor were made in order to rebut the statements made by defense counsel and appear to explain the prosecutorial process and the burden of proof.

The comments complained of by the Defendant were not improper and this assignment of error lacks merit.

"[A]n argument with regard to the credibility of a witness is proper where the credibility of the witness is in question and the facts bearing on the witness' credibility appear in the record. *State v. Sayles*, 395 So.2d 695 (La.1981); *State v. Procell*, 365 So.2d 484 (La.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979); *State v. May*, 339 So.2d 764 (La.1976); *State v. West*, 319 So.2d 901 (La.1975)." *State v. Brewer*, 38,515, pp. 9-10 (La.App. 2 Cir. 8/20/04), 880 So.2d 1005, 1011, *writ denied*, 04-2509 (La. 2/18/05), 896 So.2d 27. The credibility of J.W. and C.M. was clearly at issue in this case. The defense attorney pointed this out in his closing argument when he informed the jury that the case hinged on the credibility of C.M. and J.W. Accordingly, a comment by the prosecutor in reference to their credibility was not improper.

In conclusion, any reference by the prosecutor to the credibility of the State's witnesses was proper.

48

## Racially-Biased Statements

The Defendant contends the trial court erred in failing to declare a mistrial when the State induced inappropriate racially-biased statements. The Defendant contends the State induced testimony from C.M. that the Defendant did not want her to go to school because there were "blacks" and "niggers" there. The Defendant contends these statements were irrelevant and immaterial to the State's case and were highly inflammatory; yet, the trial court declined to admonish the jury or declare a mistrial.

The State contends the testimony at issue was not immaterial or irrelevant and was evidence of force or threats of physical violence used against C.M. The State also avers the Defendant used the "inhumane tactics and intimidation" testified to in order to repeatedly forcibly rape C.M.

During the testimony of C.M., the State asked her what she did to deserve a bull whipping. She responded, in pertinent part, as follows: "he thought I was sleeping . . . with niggers at school . . . ." Defense counsel did not object to this testimony.

The State later asked C.M. if the Defendant ever used guns to threaten her. C.M. responded as follows: "he held a pistol to my head and told me that it would be better for my brains to be blown out than me to sleep with niggers at school." The State asked C.M. four more questions and then indicated its questioning of her was complete.

Defense counsel then asked for a sidebar conference wherein he informed the court that he thought the use of the "N" word by C.M. was improper and was an attempt to inflame the jury. The trial court informed defense counsel there was no contemporaneous objection. Defense counsel told the court that "once it's out, it's out." Although the transcript does not indicate that defense counsel moved

for a mistrial, the trial court made the following comments: "Well, the Court will note your objection. Deny your motion for mistrial."

> Pursuant to La.Code Crim.P. art. 771, the trial court may:
>
> > [G]rant a mistrial if an admonition is not sufficient to assure the defendant of a fair trial when a witness makes an irrelevant or immaterial remark or comment of such a nature that it might create prejudice against the defendant in the mind of the jury. When the trial court is satisfied that an admonition to the jury is sufficient to protect the defendant, that is the preferred remedy. A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. *State v. Narcisse*, 426 So.2d 118, 133 (La.1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).

*State v. Givens*, 99-3518, p. 12 (La. 1/17/01), 776 So.2d 443, 454.

The Defendant alleges there were four African-Americans on the jury. However, that information is not found in the record. The information may have been given in a sidebar conference, as there are numerous sidebar conferences in the record wherein portions of the conferences are inaudible. During the sidebar conference following C.M.'s testimony, the following comments were made by defense counsel: "For the record (inaudible) members of the jury."

In *State v. Mayeaux*, 570 So.2d 185 (La.App. 5 Cir. 1990), *writ denied*, 575 So.2d 386 (La.1991), the defendant moved for a mistrial when a recorded conversation between himself and the victim was played to the jury. During that conversation, the defendant referred to blacks as "niggers." The mistrial was denied. On appeal, the defendant argued that this reference was highly prejudicial. The court reviewed the matter under La.Code Evid. art. 403 and found the reference was not racially-motivated, but was characteristic of the defendant's manner of expressing himself. The conclusion was supported by the fact that the defendant used numerous expletives during the conversation and the term at issue was no more prejudicial or inflammatory than the other expletives used.

In *State v. Tran*, 98-2812 (La.App. 1 Cir. 11/5/99), 743 So.2d 1275, *writ denied*, 99-3380 (La. 5/26/00), 762 So.2d 1101, a police officer testified that the defendant was arrested by the Asian Gang Task Force. On this basis, the defendant moved for a mistrial, alleging that the use of the word "gang" was highly prejudicial and served only to inflame the jury. The trial court noted there had been a pre-trial ruling excluding the use of the word at trial and the prosecutor had informed officers not to use the word. Additionally, the prosecutor maintained there was no intent to show the defendant was in a gang. The motion was then denied. The appellate court held there was no showing of clear prejudice and there was no indication the defendant was unable to obtain a fair trial because of the officer's statement. Additionally, the use of the word was not deliberately obtained by the prosecutor in order to prejudice the defendant's rights.

In *State v. Kaufman*, 278 So.2d 86 (La.1972), the state asked a witness the following question on re-direct:

> 'Do you deny that you told Patricia Butler that there were just two *White honkys* who got killed, and if it had been two colored people they would have forgotten about it? Do you deny that you told her that?' (The witness replied: 'Yes, I do.')

*Id*. at 96 (emphasis added).

Ms. Butler was called as a witness and testified that the prior witness "said something about honkys." The state inquired about the prior witness' remarks. Ms. Butler then testified that "She said something about the honkys." The state again inquired, asking Ms. Butler what the prior witness said about white honkys. Ms. Butler testified as follows: "She just kept saying the white honkys. She said something about the honkys, these two men that was killed." During closing arguments, the prosecutor stated: "She denies that she told her [i.e., Patricia Butler] don't worry about these two

white honkys." *Id*. at 97. Defense counsel made several objections regarding the above quoted comments. These objections were denied.

The appellate court went on to hold that whether or not the witness mentioned anything about honkys was irrelevant to the guilt or innocence of the defendant. The court held that a mistrial should have been granted because the repeated emphases of the derogatory epithet used by an associate of the defendant "could have only the effect of inflaming the white jury." *Id*. at 98.

In the case at bar, the prosecutor informed the trial court of the following once defense counsel objected to C.M.'s testimony: "On the fact that it was just a recitation by the witness. I wasn't expecting on more than one occasion she would say that, but so be it. There's a lot of things that could inflame a jury."

The testimony at issue does not rise to the level of that in *Kaufman*, 278 So.2d 86. The case at bar is most similar to *Mayeaux*, 570 So.2d 185, and *Tran*, 743 so.2d 1275. However, the case at bar is distinguishable from *Mayeaux* in that it appears the prosecutor in this case did not deliberately elicit the testimony at issue. Accordingly, the trial court did not abuse its discretion when denying the Defendant's motion for mistrial regarding C.M.'s testimony. Additionally, the Defendant did not request an admonishment to the jury; therefore, the trial court did not err in failing to give one. *State v. Texada*, 99-1009 (La.App. 3 Cir. 2/2/00), 756 So.2d 463, *writ denied*, 00-2751 (La. 6/29/01), 794 So.2d 824.

This assignment lacks merit.

**Prosecutorial Abuse of Grand Jury Power**

The Defendant argues that the trial court erred in denying his October 8, 2001 motion to dismiss the indictment based on the prosecutorial abuse of grand jury power. The Defendant alleges that the prosecution abused the grand jury system

by using post-indictment grand jury subpoenas to force witnesses to testify in order to prepare the State's case for trial. The Defendant claims that the use of the grand jury system to obtain the testimony of Judy Chisom and Cheryl Bates was improper because their testimony would not have led to any further indictments due to double jeopardy prohibitions.

On October 16, 2001, the district court conducted a hearing on Defendant's motion to dismiss the indictment. At the hearing, the Defendant argued that the prosecution abused the grand jury process under La.Code Crim.P. arts. 437 and 439 because there was no offense being investigated in Catahoula Parish in September 2001 when the women were subpoenaed to testify before the grand jury. The Defendant claimed that the investigation against him concerning C.M. had been completed when the grand jury returned its indictment and that the women could only testify to incidents occurring between ten and fifteen years prior to the hearing. Based on those assertions, the Defendant asked the trial court to either dismiss the indictment or to exclude the testimony at issue from the trial.

The State responded that the record did not support the Defendant's arguments because the grand jury was allowed to investigate other crimes and because the grand jury could have issued other indictments based on the women's testimony. The State contended that the original indictment only charged the Defendant with aggravated rape based on the victim being under the age of twelve, but, following the women's testimony, the grand jury then amended the indictment to charge the Defendant with aggravated rape under La.R.S. 14:42 in its entirety, not just under subsection (A)(4). After listening to the arguments presented by both sides, the district court granted the prosecution seven days to file a memorandum in support of its arguments.

53

The State filed its answer to the Defendant's motion. In its answer, the State responded that the Defendant's allegations were mere speculation and reiterated that, subsequent to the testimony of Judy Chisom and Cheryl Bates, the indictment was amended to broaden the grounds for the charges; the charges then encompassed La.R.S. 14:42 instead of citing to specific sections of the statute. The trial court issued a ruling, which found that the law was in favor of the prosecution and denied the Defendant's motion to dismiss the indictment.

The Defendant claims that the prosecutor improperly subpoenaed Judy Chisom and Cheryl Bates to testify before the grand jury because no further indictments against him were being contemplated at that time. The Defendant contends that the women's testimony was improper because they would have only been able to testify about prior offenses, which had already been prosecuted. However, no indictment shall be quashed or conviction reversed because the grand jury based its indictment, in whole or in part, on illegal evidence. La.Code Crim.P. art. 442. Therefore, this claim is insufficient to merit a quashed indictment or reversed conviction.

The Defendant argues that prosecutorial misconduct is grounds for dismissing the indictment if it constituted a due process violation and affected the decision of the grand jury when considering the issuance of the indictment. Prosecutorial misconduct may warrant a quashed indictment if it, by nature, misled or unfairly affected the integrity of the grand jury as an independent and unbiased body. *State v. Walker*, 567 So.2d 581 (La.1990).

> The ultimate issue in a motion to dismiss an indictment on the basis of prosecutorial misconduct is whether the proved misconduct warrants such a drastic remedy. The remedy for prosecutorial misconduct should generally be tailored to the injury suffered from the misconduct. . . . Absent demonstrable prejudice, dismissal of the indictment is plainly an inappropriate remedy for

54

> misconduct by the prosecutor's attempting to obtain evidence illegally.

*Id*. at 586-87. In cases of obvious prejudice, the supreme court has quashed defendants' indictments; such prejudice occurs when an accused is compelled to testify against himself before the grand jury. *State v. Smalling*, 240 La. 915, 125 So.2d 409 (La.1960); *State v. Harrell*, 228 La. 434, 82 So.2d 701 (La.1955).

The Defendant did not demonstrate either the occurrence of prosecutorial misconduct or sufficient prejudice to merit the dismissal of the indictment because he failed to show that the State could not have prepared its case for trial without the women's grand jury testimony. The Defendant did not allege that the women would have refused to voluntarily submit to questioning at the district attorney's request. Also, under La.Code Crim.P. art. 66(A), the prosecution may move for the issuance of a subpoena ordering the person named in the motion to submit to questioning concerning any offense being investigated by the prosecutor's office. Thus, the Defendant failed to show that the State obtained information through the grand jury subpoena process that would have otherwise been protected.

Alternatively, the Defendant asserts that the women's testimony should have been suppressed because, even if the prosecutorial misconduct does not amount to a due process violation, the court may suppress the evidence gathered as a result of the prosecutorial misconduct because it is the fruit of the prosecutor's transgression. *Walker*, 567 So.2d 581. However, because the information in this case was readily available to the prosecutor through other means, the women's testimony was not demonstrably the fruit of any transgression by the prosecutor. *Id*. Also, as the grand jury had already indicted the Defendant for aggravated rape, there was no indication that the testimony misled or unfairly affected the integrity of the grand jury. *Id*.

Thus, this assignment of error is without merit.

**Request for Production of C.M.'s Grand Jury Testimony**

The Defendant contends the trial court erred by not granting his request for production of C.M.'s grand jury testimony to show inconsistencies between it and her trial testimony.

In his July 28, 2004 "Motion for Production of Videotaped Interview and Grand Jury Testimony of [C.M.]," the Defendant sought the victim's grand jury testimony so that he could show inconsistencies between the testimony given at the grand jury hearing and that given at trial. The Defendant claimed that C.M. must have testified before the grand jury that her first sexual encounter with the Defendant was in 1990 because the grand jury returned an indictment for a 1990 aggravated rape. At the September 7, 2004 hearing, the Defendant argued that he should have had access to the grand jury testimony for impeachment purposes because her trial testimony stated that the first encounter occurred in 1991. The Defendant asserted that the denial of his motion deprived him of a meaningful opportunity for cross-examination.

At the post-trial hearing, the State responded that La.Code Crim.P. art. 434(a) preserved the secrecy of grand jury proceedings. The State averred that it had dropped the 1990 aggravated rape charge because C.M.'s trial testimony stated that she did not know for certain that the aggravated rape had occurred in 1990. The State further asserted that, during pretrial, the district court had examined the victim's grand jury testimony for *Brady* material. After viewing the statement, the trial court concluded that it contained no *Brady* material. The State argued that, even if the testimony could be used for impeachment, it still was not *Brady* material because it

56

was not material evidence that would have made a difference in the outcome of the case because the State had dismissed the 1990 aggravated rape indictment.

After listening to both sides, the trial court balanced the Defendant's interest in impeaching the victim's credibility against the State's duty to preserve the secrecy of grand jury proceeding, and denied the Defendant's motion. The Defendant now contends that the trial court erred by not granting his request for production of C.M.'s grand jury testimony.

Louisiana Code Criminal Procedure Article 434 provides only two exceptions to the grand jury secrecy rule:

> A. Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury. However, after the indictment, such persons may reveal statutory irregularities in grand jury proceedings to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand jury with counsel for a person under investigation or indicted, with the attorney general or the district attorney, or with the court.
>
> . . . .
>
> C. Any person who violates the provisions of this article shall be in constructive contempt of court.

The Louisiana Supreme Court has consistently held that grand jury testimony may not be used to impeach a witness; instead, grand jury testimony may only be used in prosecutions for perjury, when a witness has admitted to committing perjury, and in order to show statutory irregularities in the grand jury proceedings. *State v. Barker*, 628 So.2d 168 (La.App. 2 Cir. 1993), *writ denied*, 93-3194 (La. 3/25/94), 635 So.2d 236; *State v. Neslo*, 433 So.2d 73 (La.1983); *State v. Trosclair*,

57

443 So.2d 1098 (La.1983), *cert. dismissed*, 468 U.S. 1205, 104 S.Ct. 3593 (1984); *State v. Ates*, 418 So.2d 1326 (La.1982); *State v. Prestridge*, 399 So.2d 564 (La.1981); *State v. Sheppard*, 350 So.2d 615 (La.1977); *State v. O'Blanc*, 346 So.2d 686 (La.1977); *State v. Ivy*, 307 So.2d 587 (La.1975); *State v. Terrebonne*, 256 La. 385, 236 So.2d 773 (La.1970). Thus, Defendant was not entitled to the victim's grand jury testimony for impeachment purposes.

Therefore, this assignment of error is without merit.

### Recusal of Trial Judge

The Defendant contends that the trial court erred in refusing to recuse Judge Boothe after he made several "off the record" comments indicating the Defendant was guilty. During trial, defense counsel made an oral motion for the recusal of Judge Boothe, relying on La.Code Crim.P. art. 671(A)(1) as support. Judge Bennett conducted a hearing on the motion.

At the hearing, Judge Boothe admitted that on the day prior to the hearing, he commented that he would not bet his children's lives, but he would bet his life that Willis committed the crimes.[6] He testified that during discussions in chambers, he indicated he felt the Defendant was guilty based on his evaluation of the witnesses and evidence. When asked if he made similar statements prior to the presentation of evidence in the case, Judge Boothe stated that he had made similar statements earlier, although he could not confirm exactly when they were made. However, he denied forming an opinion regarding the Defendant's guilt during pretrial proceedings and explained that it was not until hearing some of the witnesses' trial testimonies that he reached this conclusion.

---

[6]This comment was made at a hospital the day prior to the hearing. In questioning the judge, defense counsel said that a video deposition had been taken the previous afternoon at Rapides Regional Medical Center. Presumably, the judge was there and this is the hospital he was referring to.

Judge Boothe also admitted that during a "bull session," he made comments indicating his belief that the victim was telling the truth. For example, he explained that the fact that the victim, when locked in her room, would use her bedroom trash can as a toilet to avoid having to go through the Defendant's bedroom to get to the bathroom indicated she was being truthful in her allegations. Judge Boothe also admitted to saying that in his opinion, the D.A. was pitching a shutout.

At the hearing, Judge Boothe testified that he has a ten-year-old daughter, the same age as the victim in the case. Judge Booth explained that the Defendant's wife was involved to some degree in the offenses against her daughter. He admitted that he made the comment that he did not think his wife would tolerate behavior such as the Defendant's if she was placed in the same situation. He also acknowledged that during an in-chambers conversation with counsel, he got choked up while making a comparison of the victim to his ten-year-old daughter.

When asked if he expressed horror and outrage at what the Defendant was accused of, Judge Boothe explained that he would express horror and outrage at any individual accused of acts such as those allegedly committed by the Defendant.

During the course of trial, Judge Boothe ruled that other crimes evidence from 1981 offenses in LaSalle Parish was admissible. This was a hotly-contested issue. According to Judge Boothe, after ruling on that issue and after the two victims from those offenses testified, he made the comment that he thought the Defendant got a "cakewalk" in LaSalle Parish and he acknowledged making a statement similar to "it ain't going to happen here." However, Judge Boothe did not recall saying that the Defendant was going to get the maximum sentence.

To put the "cakewalk" comment in context, the prosecutor, on cross-examination, established that Judge Boothe knew that the Defendant was a trustee in LaSalle Parish and that he was allowed to drive deputy cars out of state. The State

additionally pointed out that in this case, the Defendant was facing a mandatory life sentence.

Despite the comments and opinions expressed by Judge Boothe, he maintained that he could put everything aside and give the Defendant a fair and impartial trial. In further support of his statement, Judge Boothe explained:

> As a lawyer, Mr. Hymel, I represented, and argued outspokenly, with passion, on behalf of clients who were accused of despicable and horrible things. Some of them which they did. I was professional enough to put aside my personal feelings and do my job as an attorney representing someone, my client, that I had severe, personal outrage at. Horror at their acts. I represented them with effectiveness and enthusiasm, putting aside my personal feelings. I did that as an attorney. I can do the same thing as a judge.

During cross-examination, the State pointed out that Judge Boothe had ruled in favor of the defense on several motions filed in conjunction with the case. For example, Judge Boothe testified that he had granted a defense motion to suppress as well as a defense motion to quash (on the basis that the time limitations had run). He also denied a State motion to exclude hearsay and acknowledged that he incorporated "almost verbatim" jury instructions proposed by the defense. Additionally, on motion of the defense, Judge Boothe removed a juror after the jury was sworn and he allowed the video deposition of a defense witness the day prior because he felt the Defendant's "defense was entitled to that man's testimony." On redirect examination, the defense readdressed some of these rulings, noting the judge's actions were supported legally.

Judge Bennett ruled that the defense fell "woefully short" of meeting its burden. Although the defense presented evidence that Judge Boothe has an opinion which he expressed, Judge Bennett noted that Judge Boothe does not make the decision as to the Defendant's guilt or innocence. He further noted that even in light

60

of Judge Boothe's belief that the Defendant is guilty, he went beyond the call of duty in driving to Alexandria for a defense deposition the previous day.

On appeal, the Defendant contends that the statements made by Judge Boothe reflect his bias and prejudice against the Defendant. He contends it is clear that Judge Boothe could not and did not conduct a fair and impartial trial in that his bias affected his rulings and the comments made throughout the trial.

Louisiana Code of Criminal Procedure Article 671(A)(1) provides:

A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:

(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial.

"A trial judge is presumed to be impartial. The burden is on the defendant to prove otherwise." *State v. Dooley*, 38,763, pp. 23-24 (La.App. 2 Cir. 9/22/04), 882 So.2d 731, 745, *writ denied*, 04-2645 (La. 2/18/05), 896 So.2d 30. In *State v. Battieste*, 597 So.2d 508 (La.App. 1 Cir.), *writ granted in part on other grounds*, 604 So.2d 960 (La.1992), on the second day of trial, during a hearing concerning a request for self-representation by the defendant, the judge commented outside the presence of the jury that he knew the defendant was guilty because his fingerprint was found at the crime scene. The defense filed a motion to recuse the judge from presiding over the motion for new trial hearing. The motion alleged that the judge could not be fair and impartial due to his opinion that the defendant was guilty. At the recusal hearing, the judge maintained that he could be fair and impartial and that he would recuse himself if he had any bias prejudice or personal interest. He explained that the statement he made was the best way for him to impress upon the defendant the strength of the evidence against him. He further said that he

61

wanted the defendant to have the assistance of counsel because he felt the defendant would be convicted. The first circuit held:

> The statement at issue, which was not communicated to the jury, is not a ground to recuse the trial judge from hearing and deciding the motion for a new trial. *Cf. State v. Tyler*, 342 So.2d 574 (La.1977). Although a trial judge's preconception of the defendant's guilt in a bench trial is probably grounds for recusation, such is not necessarily the case in a jury trial. *State v. Littleton*, 395 So.2d 730 (La.1981); *State v. Manning*, 380 So.2d 54, 58 n. 6 (La.1980).

*Id.* at 514.

In *State v. Collins*, 288 So.2d 602 (La.1974), after the close of jury selection, defense counsel informed the judge that his client had been charged with three offenses since his arrest on the charge being tried. The following day, the judge repeated this information to the clerk of court in the presence of another person. Upon learning that the person was a juror, the judge removed him from the jury and instructed him not to relate the information to any other panel members. The juror testified outside the presence of the jury that he had not shared this information with any other jurors.

After this incident occurred, the defendant filed a motion to recuse the judge, asserting the following grounds:

> On the following morning the defendant filed a written motion setting forth that the trial judge was biased, prejudiced and personally interested in the cause to such an extent that he was unable to conduct a fair and impartial hearing, as demonstrated by the court's conduct in essentially two areas. The first was the judge's statement made in the presence of the juror on the morning of the second day of trial and related more particularly hereinabove. The second had to do with the judge's conduct during the course of the trial, i.e., in the manner in which he had overruled defendant's objections and sustained the State's objections, his facial expressions to the court reporter and to the jury, and his disparaging remarks about defendant's objections and motions. A third assertion having to do with the court's ruling excluding

62

certain testimony on cross examination from a State witness, as a means for demonstrating the court's bias hardly warrants discussion. If the Judge ruled incorrectly defense counsel should have perfected a bill of exceptions rather than here complain that the Judge's adverse ruling indicates bias on his part.

*Id.* at 603.

The supreme court, in finding that the judge did not err in refusing to refer the recusal motion to another judge for consideration, held:

It does not logically follow that a judge, who has passed on information furnished him by defense counsel as to defendant's crimes allegedly committed by defendant after the crime for which he is being tried, has a personal interest in seeing the defendant convicted. It is at least as likely if not more so that a judge is fully capable of performing his duties impartially, notwithstanding his receiving information from defense counsel and his repeating same in private conversation outside of court. A judge is presumed to be impartial. Beland v. United States, 117 F.2d 958 (5th Cir.) cert. denied, 313 U.S. 585, 61 S.Ct. 1110, 85 L.Ed. 1541 (1941). In State v. Laborde, 214 La. 644, 38 So.2d 371 (1949), where a stronger allegation was made, this Court said that even a judge's remark that the defendant charged with attempting to steal hogs would have a better chance before a jury than before the court did not show that court was prejudiced against the defendant or would be unable to give him a fair and impartial trial so as to require the judge to sustain the motion for recusation or refer it to another judge for trial.

As to defense counsel's other allegations in the motion to recuse, "(1) the manner in which he has overruled defendant's objections and sustained the state's objections; and (2) knowing facial expressions to the court reporter and the jury, (3) disparaging remarks about defendant's objections and motions," we failed to see that the defendant has substantiated any of these allegations of the judge's bias, prejudice or interest. Those allegations are mere conclusions of defense counsel, and represent his personal opinion of the judge's courtroom demeanor. Therefore, we conclude that the trial judge properly overruled the motion as no legal cause for recusation, factually supported to our satisfaction, was set forth in the motion. State v. Angel, 141 La. 921, 75 So. 843 (1917).

*Id.* at 604-05.

The court concluded that the factual allegations were unsupported by the record. Further, the judge's removal of the juror who overheard his comment and determination that he had not informed other panel members of the information reflected a desire to run a fair, impartial and orderly trial.

In the present case, there is no indication that any of Judge Boothe's comments regarding the Defendant's guilt were made in the presence of the jury. Additionally, although no specific adverse rulings are mentioned in support of the Defendant's argument on appeal, we note the only unfavorable ruling mentioned by the Defense at the recusal hearing was the judge's ruling allowing the introduction of other crimes evidence. As noted by the supreme court in *Collins*, this unfavorable ruling does not establish bias. Judge Bennett did not err in denying the motion to recuse Judge Boothe in this case. Accordingly, this assignment of error should be denied.

## CONCLUSION

For the foregoing reasons, the Defendant's conviction and sentence for aggravated rape are affirmed. The Defendant's convictions and sentences for forcible rape for the years 1992, 1993, and 1994 are vacated and judgments of guilty of sexual battery are entered. The matter is remanded for sentencing in accordance with this court's opinion. We determine that the Defendant's conviction for forcible rape for the year 1995 is vacated for lack of evidence.

**AFFIRMED IN PART; REVERSED IN PART.**

**CONVICTION AND SENTENCE FOR AGGRAVATED RAPE AFFIRMED.**

**CONVICTIONS FOR FORCIBLE RAPE FOR THE YEARS 1992, 1993, AND 1994 VACATED; JUDGMENTS OF GUILTY OF SEXUAL**

**BATTERY FOR THE YEARS 1992, 1993, AND 1994 ENTERED AND CASE REMANDED FOR SENTENCING.**

**CONVICTION FOR FORCIBLE RAPE FOR 1995 VACATED AND JUDGMENT OF ACQUITTAL ENTERED.**

NUMBER 05-218

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STATE OF LOUISIANA

VERSUS

ROBERT S. WILLIS

**Pickett, Judge, dissenting in part.**

I concur in the majority's opinion to the extent that it affirms the defendant's conviction for aggravated rape. I disagree with the majority's conclusion that the convictions for forcible rape committed in the years 1992, 1993, and 1994 should be vacated. I would find that the evidence, when viewed in the light most favorable to the prosecution, supports the defendant's convictions for forcible rape in those years. Further, I would find that the evidence supports a jury's conclusion that the victim failed to consent to having sexual intercourse with the defendant in 1995, and would affirm the defendant's conviction for the forcible rape committed in 1995. I would also affirm the sentences imposed for all of the convictions for forcible rape. For these reasons, I respectfully dissent.